Marvyn GOULD, Executor of the Estate of J. Donald Rogasner, and J. David Pincus, on behalf of themselves and all others similarly situated, Plaintiffs,

Mary S. McCord and Charles T. McCord, Jr., Intervening Plaintiffs,

v.

AMERICAN HAWAIIAN STEAMSHIP COMPANY et al., Defendants.

Civ. A. No. 3707/3722.

United States District Court, D. Delaware.

Sept. 17, 1971.

William Prickett and Rodman Ward, Jr., of Prickett, Ward, Burt & Sanders, Wilmington, Del., Harold E. Kohn and Aaron M. Fine, of Harold E. Kohn, P. A., Philadelphia, Pa., for plaintiff Gould and all those similarly situated and for intervening plaintiffs.

Ralph F. Keil, of Keil & Keil, Wilmington, Del., for plaintiff Pincus.

S. Samuel Arsht, and William O. La-Motte, III, of Morris, Nichols, Arsht & Tunnell, Wilmington, Del., Richard Nolan and Christopher Croley, of Davis, Polk & Wardwell, New York City, for defendant R. J. Reynolds Tobacco Company.

David F. Anderson and Richard F. Corroon, of Potter, Anderson & Corroon, Wilmington, Del., John W. Castles, III, Roger C. Ravel, Mason G. Kassel, Joseph F. McDonald and Franklin B. Velie, of Lord, Day & Lord, New York City, for defendants American-Hawaiian Steamship Company, National Bulk Carriers, Inc., Litton Industries, Inc., Monroe International Corporation Retirement Plan Trust, Daniel K. Ludwig, Hal A. Kroeger and Joseph T. Casey.

R. Franklin Balotti, of Richards, Layton & Finger, Wilmington, Del., W. Foster Wollen, of Shearman & Sterling, New York City, for defendants Malcolm P. McLean, James K. McLean, Clara L. McLean, Disque D. Deane, Edward A. Hirs, James T. Murff and Beverly R. Wilson, Jr.

## CONSOLIDATED OPINION

CALEB M. WRIGHT, Chief Judge.

On November 10, 1970, this Court denied the plaintiffs' and the defendants'

motions for summary judgment without prejudice to their respective rights to renew said motions.[1] This case is presently before the Court upon the plaintiffs' renewed motion for partial summary judgment on the issue of liability under the Securities Act of 1934, Section 14(a); 15 U.S.C. Section 78n(a), and certain of the defendants' renewed cross-motions for summary judgment. The relevant facts are found in the pleadings, defendants' answers to interrogatories, oral depositions, affidavits, and other documents submitted to the Court.

## I. FACTUAL BACKGROUND

The basis of this litigation is the merger of McLean Industries, Inc. ("McLean") into R. J. Reynolds Tobacco Company ("Reynolds"). Since the factual background to this case has been summarized in the Court's earlier opinion, 319 F.Supp. at 797–800, there is no necessity for a detailed reiteration of this history. Thus, the Court will limit its discussion of the facts to those specifically pertinent to the issues raised in the summary judgment motions.

The defendants in the case are (1) Reynolds and McLean, (2) the ten members of the board of directors of McLean all of whom voted to approve the merger, and (3) certain shareholders who are alleged to have received favored treatment under the merger agreement, i. e., American-Hawaiian Steamship Company ("American-Hawaiian"), National Bulk Carriers, Inc., ("National Bulk"), Litton Industries, Inc., ("Litton"), Monroe International Corporation Retirement Plan Trust ("Monroe"), and Hal A. Kroeger (sometimes hereafter referred to with no pejorative intent as "the favored defendants").

At all material times the pertinent relationships between the various defendants were essentially as follows. Mr. McLean was president of McLean Industries and a member of its board of directors; Ludwig, Kroeger, Casey, Wilson and the other individual defendants were members of the McLean board of directors. Ludwig was the sole owner of National Bulk. It owned Berkshire Industries, Inc., which in turn owned 90% of American-Hawaiian. Kroeger was a director and chairman of the board of American-Hawaiian. Casey was the senior vice president of Litton and a member of the investment committee of Monroe, a Litton pension fund.[2]

The various defendants associated with McLean were also stockholders:

| Name | Shares of McLean Common Stock Owned | Percentage of McLean Common Outstanding |
|---|---|---|
| Mr. McLean | 3,609,473 | 33.9% [4] |
| Litton | 965,000 [3] | 9.1% |
| Monroe | 85,000 [3] | 0.8% |
| National Bulk | 250,000 | 2.4% |
| American-Hawaiian | 1,000,000 | 9.4% |
| Mr. Kroeger | 4,000 | 0.0% |
| | 5,913,473 | 55.6% |

This suit was commenced as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all common shareholders of McLean other than the defendants. On February 27, 1970, the Court ordered that the action be maintained as a class action.

The plaintiffs' complaint challenged the then proposed merger of McLean into Reynolds on four counts. The first count alleged that the merger provisions discriminated against the plaintiffs' class in that the favored defendants were to receive $50 for each of their shares of McLean's common stock, while all other common shareholders of McLean would receive one share of a newly issued Rey-

---

1. The Court's Opinion is reported at 319 F.Supp. 795 (D.C.1970).

2. The investment committee corresponds to the board of directors.

3. On April 30, 1969, prior to the merger, Litton sold 100,000 of its shares to Mon-

roe, thus changing their totals accordingly. Plaintiffs' Brief at 6; certain Defendants' Brief at 58.

4. Shares owned by Mr. McLean's family increased the figure to approximately 40%.

nolds $2.25 Convertible Preferred Stock, allegedly worth substantially less than $50 per share, for each of their shares of McLean common stock. It further alleged that in approving the merger, the defendants, other than Reynolds and McLean, had either breached the fiduciary duty which they owed to McLean stockholders or participated in that breach, and that the defendants' actions were part of a scheme to defraud the plaintiffs' class, carried out through interstate commerce, the mails and the New York Stock Exchange in violation of 10 (b) of the Securities and Exchange Act of 1934 and Rule 10b–5 thereunder and perpetrated by the dissemination of proxy statements containing material omissions designed to effectuate the scheme to defraud plaintiffs' class.

Incorporating the material allegations of Count I, Count II alleges that McLean's proxy materials violated Section 14(a) of the 1934 Act and Rule 14a–9 thereunder.

Counts III and IV both allege breaches of common law fiduciary duty by reason of the matters alleged in Count I. Count III is based on pendent jurisdiction and Count IV on an alleged diversity of citizenship and the requisite monetary amount. Neither count is involved in the instant motions.

The plaintiffs' initial and present motions for partial summary judgment are based upon the claim that the McLean proxy materials relating to the merger were materially false and misleading as a matter of law. The allegedly inadequate proxy statement, including a two-page letter of Malcolm McLean, was mailed April 10, 1969 to all McLean stockholders for the principal purpose of informing shareholders regarding the proposed merger and soliciting their support for it. In these two motions, the plaintiffs have claimed that the proxy materials are deficient in the following respects:

(1) The proxy materials stated that the favored defendants "have agreed to vote for the merger."

(2) The proxy materials stated that the purchases of the shares of the favored defendants at $50 per share in cash "will not be tax-free transactions for the sellers, whereas it is anticipated that the exchange of stock in the merger will be tax free for other holders of McLean Common Stock."

(3) The proxy materials did not disclose an alleged "veto power" which the Litton group and the National Bulk group had over any McLean merger.

(4) The proxy materials did not disclose two alleged "conflicts of interests."

(a) The fact that Mr. McLean negotiated for both the favored defendants and the remaining shareholders.

(b) The fact that the defendants Ludwig, Kroeger, and Casey who were affiliated with the favored defendants had a conflict of interest as members of the McLean board of directors.

The defendants deny that the questioned statements are false or misleading and argue that even if they are found to be false or misleading they are immaterial as a matter of law.

## II. APPLICABLE STATUTES, RULES AND LEGAL STANDARDS

The plaintiffs' initial motion for summary judgment was based on both sections 10(b) and 14(a) of the 1934 Securities Exchange Act and rules adopted to implement these sections.[5] After examination of the interrelationship of the sections and the legal standards applicable to both, this Court concluded that if any difference existed between the appropriate standards, § 14 was more favorable to plaintiff than § 10, and considered solely plaintiffs' § 14 claims with-

---

5. The applicable statutes and rules are frequently cited and well known and need not be reiterated here. The pertinent rules are contained in footnote 10 of the earlier opinion, 319 F.Supp. at 800–801.

out prejudice to plaintiffs' rights to assert § 10 claims subsequently. The parties have renewed their initial motions, and § 10 claims may be before this Court. However, since the parties have briefed and argued this motion under § 14(a) and this Court continues to adhere to its initial decision, this motion will be determined solely under § 14(a).

The issues here are identical to those presented in the former motion for summary judgment; (1) whether the attacked statements in the McLean proxy materials are false and misleading or the alleged omissions are necessary in order to make the statements made not false and misleading; and (2) whether the misstatements or omissions are "material." This twofold analysis of the respective alleged material misstatements and omissions is contained in Part III of this opinion, infra.

The standard of materiality applicable here was set forth by the Supreme Court in Mills v. Electric Auto-Lite Co., 396 U.S. 375, 384, 90 S.Ct. 616, 621, 24 L. Ed.2d 593 (1970):

> Where the misstatement or omission in a proxy statement had been shown to be "material," as it was found to be here, that determination itself indubitably embodies a conclusion that the defect was of such a character that it might have been considered important by a reasonable shareholder who was in the process of deciding how to vote. This requirement that the defect have a significant *propensity* to affect the voting process is found in the express terms of Rule 14a–9, and it adequately serves the purpose of ensuring that a cause of action cannot be established by proof of a defect so trivial, or so unrelated to the transaction for which approval is sought, that correction of the defect or imposition of liability would not further the interests protected by § 14(a). (Footnote omitted, emphasis in original)

Each side once again contends that the Court cannot grant summary judgment for its opposite. However, as was discussed in some detail in the opinion on the prior summary judgment motion 319 F.Supp. at 802–803, although summary judgment involving liability under § 14 (a) and the question of materiality present difficult problems, such judgment may be entered where "the discrepancies in basic data are so large, and the facts misrepresented and withheld are so obviously important to an investor, that reasonable minds cannot differ on the question of materiality," 319 F.Supp. at 803 quoting Johns Hopkins University v. Hutton, 422 F.2d 1124, 1129 (4th Cir. 1970).

After a review of the evidence and analysis of information submitted subsequent to the prior denial of summary judgment, this Court has concluded that the plaintiffs have sufficiently sustained the burdens under Rule 56(c) and that partial summary judgment is appropriate against certain of the defendants as regards certain of the alleged misstatements and omissions in the McLean proxy materials. In addition, the Court finds that the plaintiffs have failed to establish sufficiently the liability of certain other of the defendants. The defendants have not persuaded the Court that their cross-motion for summary judgment ought to be granted, and it is denied.

## III. THE ALLEGED MISSTATEMENTS AND OMISSIONS

The outstanding single characteristic of the merger upon which this action is predicated is the dual treatment of McLean common shareholders, the favored defendants who received $50 per share and the remaining shareholders who received a package which consisted primarily of Reynolds preferred stock. The plaintiffs have alleged the former received an unlawful premium and the defendants deny any such discrimination. Regardless of the merit of either contention, a matter which does not confront the Court herein, the Court concludes that this dual treatment of common shareholders is the type of question about

which any shareholder would be primarily concerned. Further, even if the two options were estimated to be roughly equivalent in value on a given date, the inherent differences between the modes of payment, cash and a stock issue plus a stock warrant,[6] are such that the differences would be pertinent to any reasonable stockholder. Certainly, any facts or circumstances which relate to or explain these different modes of payment are likely to be considered important to someone assessing the proposed merger. This issue is especially relevant to the question of materiality and is fundamental to the Court's analysis of the proxy statement. Since there were two groups receiving different amounts, it was incumbent upon the McLean Board to disclose fully and accurately these differences and matters relating thereto so the shareholders could ascertain for themselves the fairness of and the reasons for the merger terms.

## A. THE FAVORED DEFENDANTS' AGREEMENT TO VOTE FOR THE MERGER:

The proxy materials contain the categorical statement: "As part of the agreements [the March 25th purchase agreements with Reynolds] these five persons [American-Hawaiian, National Bulk, Litton, Monroe and Kroeger] have agreed to vote for the merger." McLean Letter, p. 1. The proxy materials also contain a later statement that concerns the favored defendants: "Each of the named stockholders has agreed, also subject to certain conditions, to vote its McLean shares in favor of the merger." McLean Proxy, p. 8.

Concluding that the precise meaning of the words "have agreed" had not yet been determined and that this ambiguity precluded summary judgment, the Court in its previous opinion stated that the plaintiff had not adequately demonstrated that the statement regarding the agreement to vote was false. The Court,

also, suggested that summary judgment would be inappropriate on the agreement issue since the hypothetical "reasonable shareholder" might construe the words "have agreed" in numerous fashions, some of which would closely approximate the actual factual situation concerning the favored defendants' position *vis-a-vis* voting their stock in favor of the merger. The Court reasoned that any such slight deviation in interpretation would not constitute a material misrepresentation. The favored defendants' responses to interrogatories answered subsequent to the first decision denying summary judgment have substantially eliminated any ambiguities the Court saw regarding the status of the voting "agreements."

The defendants contend that the statements regarding the voting agreement are neither false or misleading nor material. In essence, they raise two separate interpretations of the transaction to support their position that the statements are true. First, all of the defendants assert that the favored defendants intended to vote their shares for the merger and "have agreed" denotes such an understanding. Second, certain of the defendants, Reynolds and the directors of McLean who were not affiliated with the favored defendants, maintain that the favored defendants were legally bound to vote for the merger.

While in its earlier opinion the Court reserved decision on the proper interpretation to be given the term "agreement", the Court now concludes that regardless of the interpretation which is afforded the term, the statement fails to conform to § 14(a) requirements. To construe the words "have agreed" as the defendants first suggest would make the proxy statement misleading, and to interpret the words to signify a legally binding commitment would make the statement false.

Under their first interpretation, the defendants claim that the words "have

agreed" did not imply a legally binding commitment to vote for the merger. They assert that the words "agreement" and "have agreed" denote a range of various circumstances from a binding legal contract to a vague understanding. Citing Corbin, Williston, and Random House's Dictionary to support their contention, the defendants argue that they intended, had an understanding, and did vote for the merger. In their depositions, Ludwig, Kroeger and Casey indicated that the favored defendants intended to vote for the merger and indicated that it could be assumed that said defendants would in fact vote for the merger. (Ludwig 30–33; Kroeger 14–15; Casey 55–56). The use of the word "agreement" is said to sufficiently represent this intention or understanding regarding the voting of the stock. Thus, the defendants claim this alleged misrepresentation is little more than an attempt by plaintiff to create semantic confusion.

Accepting this interpretation of the words "have agreed" when referring to the agreement to vote, the proxy statement is misleading since it utilizes the words "agreement" and "have agreed" in the same sentence or paragraph to designate two different relationships.

The McLean proxy statement and accompanying letter discuss the agreement to vote twice.[7] In both discussions, reference is made to Reynolds' agreement to purchase the stock of the favored defendants at $50 per share. The language on page seven of the proxy statement makes it clear that this language refers to the purchase agreements between Reynolds and the favored defendants. These purchase agreements are legally binding contracts. In addition, on pages six and seven of the proxy statement, the Reynolds-McLean merger agreement is discussed. This also represents a conditional, yet nonetheless legally binding contract. Thus, while the word "agreement" is frequently employed in such fashion as to signify a legal commitment, the defendants maintain that when referring to the agreement to vote, an understanding or intention is obviously implied. The Court is convinced that any semantic gymnastics introduced into this case are of the defendants makings, and that the word agreement would be read by any reasonable man to denote a legal obligation. Therefore, if the words "have agreed" did, in fact, indicate an understanding and not a binding commitment, the Court must conclude that the state-

---

7. The McLean letter says:

> Reynolds has negotiated agreements to purchase immediately prior to the merger an aggregate of 2,300,000 shares, or approximately 22%, of McLean Common Stock from American-Hawaiian Steamship Company, National Bulk Carriers, Inc., Litton Industries, Inc. and a pension trust for its subsidiaries. These holders insisted that their shares be purchased for cash prior to the merger, and Reynolds agreed to do so at a price of $50 per share. In addition, Reynolds has agreed to purchase at the same price and time the 4,000 shares of McLean Common Stock owned by Hal A. Kroeger, a director of the Corporation who is also a director of American-Hawaiian. As part of the agreements these five persons have agreed to vote for the merger. These purchases will not be tax free transactions for the sellers, whereas it is anticipated that the exchange of stock in the merger will be tax free for other holders of McLean Common Stock.

> Management of the Corporation, including the undersigned and James K. McLean and Clara L. McLean (who own an aggregate of 4,299,393 shares, or approximately 40%, of the McLean Common Stock) has agreed to vote its shares for the merger. This, together with the five stockholders referred to above, would represent in the aggregate approximately 64% of the McLean Common Stock. In addition, the Boards of Directors of the Corporation and Reynolds have unanimously recommended that their respective stockholders approve the merger.

The proxy statement says:

> Reynolds has agreed with such stockholders [the favored defendants and Mr. McLean] that, subject to the conditions specified in the Agreement, it will use its best efforts to consummate the merger. Each of the named stockholders has agreed, also subject to certain conditions, to vote its McLean shares in favor of the merger.

ments regarding the agreement to vote are misleading. The Supreme Court stated that the purpose of § 14(a) is to insure fair and informed corporate suffrage, J. I. Case Co. v. Borak, 377 U.S. 426, 431, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964). At a minimum this would require that the proxy material be readily understandable by the shareholders and would preclude the utilization of language which can only be deciphered by discerning definitional distinctions where none are apparently necessary.

■ Having concluded that the requisite interpretation to be given the words "have agreed" is a legal commitment, the Court must determine whether such a commitment to vote the stock for the merger did exist.

An examination of the March 25th purchase agreements between the favored defendants and Reynolds reveals that nowhere do the agreements purport to bind these defendants to vote for the merger. These agreements, all substantially identical in substantive terms, indicate that the favored defendants had agreed to sell their shares for $50 per share and that Reynolds would be under no obligation to purchase their shares if, among other things, they did not vote in favor of the merger.[8]

The favored defendants have consistently and uniformly maintained that these written agreements did not legally bind them to vote in favor of the merger. The Court in its earlier opinion expressed some uncertainty regarding the existence of a legal commitment to vote;[9] however, subsequent interrogatories evidence that the favored corporate defendants claim to have been under no legally binding and enforceable obligation to vote for the merger. (Answers of

Litton, Monroe, National Bulk, American-Hawaiian to questions 23–26 of the plaintiffs' second set of interrogatories). Question 23 asks: "At the time of the issuance of the McLean Industries proxy statement of April 10, 1969, and the accompanying letter of M. P. McLean, do you contend that you were under a legally binding and enforceable obligation to Reynolds to vote your McLean shares in favor of the merger?" All four favored corporate defendants categorically answered "no". Those defendants not affiliated with the favored defendants have attempted to limit these negative responses by interpreting the question to exclude the March 25th Purchase Agreements and obligations thereunder. Such an interpretation would be anomalous in light of the unambiguous wording of the question. Since the respondents to the questions have not acknowledged this peculiar caveat to the question 23, the Court finds that the favored defendants were not legally obligated to vote for the merger under either the March 25th purchase agreements or any other contractual commitment.

Certain of the defendants have asserted that a binding legal obligation upon the favored defendants did exist in spite of their denials of same. The McLean directors, excluding Kroeger, Casey, and Ludwig, have stated that since Malcolm McLean understood that the favored defendants had agreed or promised to vote for the merger, a factual dispute regarding the existence of an agreement is thereby raised which makes summary judgment inappropriate. While Malcolm McLean's statements may raise factual disputes concerning *his understanding* of the nature of the favored defendants' obligation, the question of whether they were legally bound to vote

---

8. The Purchase Agreements read in part:
   § 4 Conditions to Reynolds' Obligation to Purchase
   4.1 The obligation of Reynolds to purchase the Owner's [favored defendants] Shares pursuant to Sec. 3 [Agreement of Sale and Purchase] is subject to satisfaction of the following conditions precedent:

(b) The owner, at the meeting of the stockholders of McLean contemplated by the Merger Agreement, shall have voted all shares of common stock of McLean owned by it * * * in favor of approving the Merger Agreement * * *.

9. 319 F.Supp. at 804–805.

for the merger is a question of law since the Court fails to perceive any ambiguity in the March 25th purchase agreements. Reynolds has claimed that it relied on Malcolm McLean's characterizations of the favored defendants agreement to vote for the merger. Since Reynolds is a party to the specific contracts in which the alleged agreements to vote are contained, it cannot seriously contend that it was somehow misled regarding the status of any voting provisions.

■ Both Reynolds and the individual defendants other than Kroeger, Casey and Ludwig, have raised several issues to substantiate the position that the favored defendants were bound to vote for the merger as a result of the March 25th purchase agreements and/or subsequent actions of Ludwig, Casey and Kroeger. They contend that the favored defendants were legally bound to vote for the merger for the following reasons: (1) in the March 25th purchase agreement, the favored defendants had specifically promised to sell shares of McLean which *had been voted for the merger*; (2) the favored defendants impliedly covenanted that they would do nothing to impair the rights of Reynolds to receive what had been promised, i. e. stock voted for the merger; (3) the acts of Ludwig, Casey, and Kroeger subsequent to March 25th in approving the language of the proxy material estopped them from denying a legal obligation to vote for the merger; (4) the same approval (3) resolves any ambiguity in the March 25th contracts regarding the obligation to vote for the merger; (5) it was necessary for these shares to be voted for the merger if the merger was to be consummated. The Court rejects each of these theories. The cases relied upon by the defendants do not support a finding of a binding legal obligation in this case. In essence, contentions one, two, four and five involve attempts to engage in construction and interpretation of the March 25th purchase agreements. As

has already been discussed, it is unnecessary for the Court to enter this arena since it fails to perceive any ambiguity in the March 25th purchase agreements. The purchase agreements provide for Reynolds' purchase of the favored defendants' McLean stock for $50 at a specified time and in a specified manner (Section 3). In addition, they provide that Reynolds will not be obligated to buy the stock unless its owner "shall have voted" for the merger. (Section 4.1(b)).[10] Thus, the question of the favored defendants voting and the possibility of their not voting for the merger was contemplated by the draftees of the purchase agreements. Generally, Courts will not imply a covenant in a contract unless it can be assumed that it would have been inserted had the drafters directed their attention to it, see Gluckman v. Holzman, 30 Del.Ch. 60, 53 A.2d 246, 249 (Del.Ch.1947). In this case, not only was the attention of the contracting parties directed toward the issue of voting for the merger, but they also adopted a specific contractual provision leaving the favored defendants a choice of either voting for or against the merger. Since it is clear from the agreements themselves that this was the intention of the parties, this Court cannot construe the purchase agreements to contain an agreement to vote clause. See generally Gluckman v. Holzman, supra, and Danby v. Osteopathic Hospital Ass'n. of Delaware, 34 Del.Ch. 172, 101 A.2d 308, 313–314 (1953).

As to the first and second contentions, Reynolds premises its position on the argument that it had only agreed to buy shares of stock which had been voted for the merger. Therefore, it claims the favored defendants were legally precluded from doing anything to interfere with this contractual right. When describing the McLean shares to be exchanged via the sales agreement, Section 3 makes no reference to shares "which had been voted for the merger", nor does it refer to any obligation upon the favored de-

10. See footnote 8.

fendants to vote their shares for the merger. In fact, if through the purchase agreements Reynolds had only contracted to buy properly voted shares, there would be no need for the Section 4.1(b) escape clause referred to above since Reynolds would have no obligation to purchase shares which had not been properly voted. In addition, Section 4.1 refers to the vote for the merger by the favored defendants as a condition precedent. This language implies that while a favorable vote was essential to consummate this contract, it was a prerequisite to binding the parties and not a requirement upon a contractually obligated seller. See Lach v. Cahill, 138 Conn. 418, 85 A.2d 481 (1951); Corbin on Contracts § 570, § 628. The Court finds nothing in the purchase agreements which supports Reynolds contention that the agreements refer to shares previously voted for the merger; in fact, there are clauses which refute this interpretation.

The several defendants assert two claims (#3 & 4) which rely upon the subsequent actions of Ludwig, Casey and Kroeger in approving the proxy material to create a legal obligation to vote for the merger. The fourth claim consists once again of an attempt to interpret the March 25th agreements to contain an obligation to vote. Having found no ambiguities in the purchase agreements, the Court rejects this interpretation.

The defendants' third claim, the estoppel claim, does not establish a legal voting agreement. In essence, the non-favored defendants maintain that by approving the proxy materials, Kroeger, Casey, and Ludwig were legally committing their respective corporations to vote for the merger. The Court is not persuaded that the actions of these three directors of McLeans when approving a proxy statement are sufficient to legally bind four corporate defendants. The cases cited by the defendants are not on point, and the defendants are attempting to utilize the doctrine of equitable estoppel not to protect an innocent party, but to insulate a wrongdoer from liability for his deception. Such a conclusion would allow a prior false statement to become "true" by the operation of later events. The favored defendants are adamant in their denial of any legal voting commitment, and the purchase agreements support their position. None of the numerous arguments raised by the non-favored defendants justify a determination that a legal voting commitment existed either by reason of the purchase agreements or the subsequent action of any of the defendants.

■ Having determined that the proxy materials are either false or misleading concerning the status of any agreement to vote for the merger, the Court additionally concludes that the statements are material. The defendants argue that any difference between the actual situation, an informal intention or understanding, and a legal obligation is at most a "technical misstatement" and is so insignificant that it could not possibly be material. In addition, they argue that it would unduly burden the McLean shareholders to present a "complex and prolix description" of the actual circumstances. Finally, they contend that the only effect on the shareholders of the misrepresentation would be to cause them to feel that the merger was a foregone conclusion and not vote at all, thereby making the merger approval more difficult.[11] The Court cannot accept these contentions. Regardless of the additional verbage requisite to accurately describe the favored defendants' position regarding voting for the merger, the status of any such agreement or understanding should have been correctly characterized. In a seventy-plus page proxy statement, if something is sufficiently important to merit special attention in a covering letter, it cannot be falsely depicted solely because a true description would be more involved. Although the defendants have suggested several hypo-

11. Favorable votes of two-thirds of the outstanding shares of common stock were a prerequisite to the McLean-Reynolds merger.

thetical descriptions of the voting arrangement to indicate the complexity of such a description, the Court is confident that counsel could have, without difficulty, constructed an accurate representation which was neither unreasonably lengthy nor unduly difficult to comprehend.

The statement concerning the agreement to vote is not insignificant. To the contrary, as the Court concluded in its earlier opinion, at least one effect of the statement that 64% of the shareholders had agreed to vote for the merger would be that the average shareholder would not give the proxy statement careful consideration because the merger would appear to be a foregone conclusion. Since § 14(a) seeks to insure the informed exercise of the franchise, any misstatement which makes the exercise seem futile and which diverts shareholder attention from careful analysis of a proxy statement for purposes of exercising the right to vote would certainly be a material defect.

In addition, the statement misrepresents the status of the favored defendants and their obligations and benefits from the sale of their McLean stock. One of the shareholder's prime concerns is to receive adequate compensation for his stock. It is obvious that any divergence between the remuneration received by the favored defendants and that given the remaining McLean shareholders would be of crucial importance to the latter group. The proxy material indicates that the favored defendants and the remaining shareholders will receive respectively $50 and Reynolds' stock. Any shareholder would be interested in the valuation of his Reynolds shares, and any information explaining or justifying the favored defendants' different treatment. The proxy materials cite several such explanations, e. g., tax treatment, agreement to vote, negotiations with Reynolds, and the fa-

vored defendants' insistence upon cash. The importance of these differences is evidenced by the fact that they are emphasized by inclusion in Malcolm McLean's letter. Any omission or misstatement which erroneously depicts the position of the favored defendants in the merger precludes a shareholder from accurately assessing the status of the proposed merger and comparing his return with that of the favored defendants. One factor justifying the merger's dual payment terms is that the favored defendants were represented to be legally committed to vote for the merger substantially before the remaining McLean shareholders. However, since there was no legally binding voting agreement, the favored defendants could have refused to vote for the merger if they had so desired. This discrepancy between the obligation to support the merger regardless of subsequent occurrences and the freedom to support or oppose the merger as subsequent events dictate is substantial variance. Any shareholder reading the proxy materials would be inaccurately apprised regarding the status of the favored defendants sale obligations. The Court finds that the misstatement regarding this status might be considered important by a reasonable shareholder deciding how to vote, and is therefore material.

**B. THE FAILURE TO DISCLOSE VETO POWER WHICH THE LITTON GROUP AND THE NATIONAL BULK GROUP HAD OVER ANY McLEAN MERGER:**

As part of financing agreements executed in 1964 and 1967 (and effective in 1969) between McLean (through subsidiaries), Litton (through subsidiaries) and National Bulk (through subsidiaries), McLean was precluded from merging or selling substantially all of its assets without, in effect, the consent of Litton and National Bulk.[12] In ad-

12. McLean and Sea-Land Service, Inc. (a McLean subsidiary) had entered such financing agreements with (a) Litton Industries Leasing Corp., a Litton subsid- iary; and (b) Containership Chartering Service—a joint Litton-National Bulk venture.

dition, as a part of these same financing agreements, McLean was limited in several regards in the manner of and extent to which it could increase outstanding indebtedness.[13]

The plaintiffs argue that the omission of any reference to the "veto power" is also a material defect. The defendants counter by pointing out that Litton and National Bulk had already given their consent to the merger when the proxy materials were issued on April 10th through Consent Agreements dated March 25th.[14] Therefore, they contend no reference to the veto power was necessary or appropriate.

The Consent Agreements do not dispose of the matter as the defendants contend. The delineation of all factors indicating reasons for or explaining the dual treatment of McLean common shareholders was essential to adequate disclosure under § 14(a). Whether or not the "veto and financing powers" had been waived as of the date of the proxy, they may have been significant factors in the dual treatment. The importance of the veto power is its *possible* effect on (a) Malcolm McLean's ability to effectively represent the remaining shareholders in the negotiations and (b) the allocation of the total amount which Reynolds was willing to pay.

In his affidavit of June 9, 1970 (Exhibit 80 of the Court's file), Mr. McLean explained certain aspects of the merger agreement and the negotiations pursuant thereto. After describing the 1964 and 1967 financing agreements with *Litton* and *National Bulk* and the restrictive conditions contained therein, McLean stated:

7. In 1968, it became obvious to me that, in order to remain competitive in increasing intense worldwide competition in shipping, I had to find some way of financing a further major expansion program for McLean. At that time our ships were not large enough or fast enough for future needs. Therefore, it was very probable that McLean would, without this expansion program, find itself at a very severe competitive disadvantage.

8. The expansion plan I envisioned as being necessary would cost in the order of $300,000,000–$500,000,000 (compared with McLean's total consolidated assets at the time of less than $300,000,000). This would involve a very large amount of debt that would substantially increase the risk inherent in McLean's common stock. If our business were to suffer reversals, for whatever reason, the equity in the common stock might have become virtually worthless. On the other hand, even if it were possible to raise any such amount from the public markets, which I did not believe to be the case, the then outstanding McLean common stock would have been greatly diluted.

---

The following is the negative merger covenants contained in both agreements referred to in the text.

(e) *Merger, etc.* McLean will not, and will not permit or suffer any Subsidiary to, enter into any merger or consolidation, acquire all or substantially all the assets of any person, firm or corporation, or sell, lease or otherwise dispose of all or substantially all of its assets, * * *. (exceptions not pertinent herein)

13. The following is the negative covenant regarding financing contained in both agreements referred to in the text.

(a) *Borrowed Money Indebtedness.* McLean will not, and will not permit or suffer any 80%-owned Subsidiary to,

either directly or indirectly, in any manner be or become liable, contingently or otherwise, in respect of any Indebtedness for borrowed money in excess of an aggregate for McLean and such Subsidiaries of $5,000,000 principal amount outstanding at any one time, and at an effective interest rate of not more than 2% per annum above the prime rate at the time incurred. * * * (exceptions not pertinent herein)

14. The defendants further contend that these are merely normal lenders' protective provisions. This is not important, since regardless of their origin, their effective veto control over the proposed merger is what is important.

9. Additionally, it was clear to me that, because of the restrictions contained in the 1964 and 1967 agreements referred to in paragraphs 3–5 above, McLean could not undertake such an expansion program.

10. Consequently, in late 1968 I met with representatives of Reynolds to discuss the possibility of some kind of consolidation of McLean with Reynolds. * * *. McLean Affidavit, p. 4.

This statement clearly evinces the necessity for the consent of the Litton-National Bulk group to accomplish the expansion which Mr. McLean felt was requisite. Prior to the commencement of any negotiations, Litton and National Bulk effectively controlled the fate of the merger, and until their demands were met, unanimous approval by the remaining shareholders would be irrelevant. The likelihood that the presence of this veto power would effect the allocation of Reynolds purchase price is so great, that its existence should have been revealed in the proxy statement.[15] The Court notes that Reynolds was merging with McLean's in its entirety and would in all probability establish a certain price which it would be willing to pay. It is the allocation of this price to shareholders which would concern the McLean shareholders, and it is the factors which may contribute to this allocation which must be disclosed. A shareholder reading the proxy materials is not made aware of the fact that the owners of approximately 20% of the McLean common stock could preclude any merger. Certainly a reasonable shareholder would consider the veto power in assessing the fairness of the dual prices and the apportionment of the total monies Reynolds was willing to pay for McLean. The shareholder should have been apprised of the veto to reach an informed opinion regarding the merger and effectively exercise his franchise. The Court therefore holds that the failure to reveal the existence of the Litton-National Bulk

merger veto and financing control powers was a material defect of the McLean Proxy statement.

C. CONFLICT OF INTEREST:

As indicated previously, the plaintiffs contend that the proxy statement is defective because it omits reference to two alleged conflicts of interest. First, the failure to set forth the fact that the defendants Ludwig, Kroeger and Casey had a conflict of interest as members of the McLean Board of Directors. Second, the failure to set forth the fact that Mr. McLean negotiated for both favored defendants and the remaining shareholders.

The Court discussed the first contention in its earlier opinion. Concluding that all relevant facts were matters of record and undisputed, the Court held that the sole question before it on this issue was whether the "various statements in the proxy statement adequately revealed to the stockholders of McLean the nature of the relationships between the favored defendants and their representatives on the McLean Board." 319 F.Supp. at 807.

The pertinent facts on this issue contained in the proxy materials are as follows:

1. American-Hawaiian, National Bulk, Litton, Monroe and Kroeger were receiving $50 cash per share for their substantial holdings. (McLean Letter, p. 1; Proxy, p. 8).

2. Other common stockholders would receive Reynolds securities. (McLean Letter, p. 1; Proxy, p. 8 *passim*).

3. Kroeger was a director of American-Hawaiian. (McLean Letter, p. 1; Proxy, p. 5).

4. Casey was a Senior Vice President of Litton. (Proxy pp. 2, 4, 40, 42).

5. Ludwig was President and principal stockholder of National Bulk. (Proxy, pp. 2, 4, 40, 41, 42).

15. In its earlier opinion, the Court suggested that it might need to know the actual effect these provisions had on the stock price. It now concludes that regardless of the effect, the facts are potentially too important to delete.

6. Kroeger, Casey and Ludwig were members of the McLean Board. (McLean Letter, p. 1 [mentions Kroeger only]; Proxy, p. 2; Proxy, p. 4 [Casey and Ludwig only], 5 [Kroeger only], 39, 40, 41 [Ludwig only], 42 [Casey and Ludwig only]).

7. The McLean Board unanimously approved the merger and recommended that the shareholders also approve it. (McLean Letter, pp. 1, 2; Proxy, p. 5).

Ludwig, Kroeger and Casey had conflicting obligations and, as a matter of law, these conflicts should have been laid before the stockholders in the proxy statement. See 319 F.Supp. at 808. Under 14(a) and in the posture of the present motions, the adequacy of the proxy disclosure of this conflict is the Court's pertinent concern.

In its previous opinion, the Court enumerated several factors relevant to the determination of the question of the adequacy of disclosure: (1) the various facts are interspersed throughout the proxy statement; (2) strong emphasis is placed upon the Board's strong and unanimous recommendation of the merger without similarly noting the three directors conflicting interests; (3) the misstatement regarding the agreement to vote, and (4) the omission of the veto power.

The Court is now of the opinion that this issue is appropriate for summary judgment. The Court therefore finds that the three directors conflicting obligations were inadequately disclosed and that this omission constituted a material defect.

The plaintiffs contend that the proxy statement should have characterized the compromised positions of Ludwig, Kroeger and Casey as being a conflict of interest, and the defendants argue that the statement need contain only facts and not characterizations. Whatever the proper characterization, undisclosed or inadequately disclosed conflicting obligations between persons representing both sides of a proposed merger has been held to be a material defect on several occa-

sions. See Mills v. Electric Auto Lite Co., 403 F.2d 429 (7th Cir. 1968), rev'd on other grounds, 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970); Kohn v. American Metal Climax, Inc., 322 F. Supp. 1331 (E.D.Pa.1970); Swanson v. American Consumer Industries, Inc., 415 F.2d 1326 (7th Cir. 1969); Madar v. Armel, CCH Fed.Sec.L.Rep. ¶ 93,027 (S.D.Ohio, 1971). The Seventh Circuit's statement in *Swanson* and *Mills* is significant:

[T]he board was not free to state its recommendation and opinion favoring the merger without giving similar emphasis to the relationship between the directors and the other party to the bargain. 415 F.2d at 1330 and 403 F.2d at 434.

In *Kohn*, Judge Masterson discussed the issue of the adequacy of certain disclosures in a case involving conflict of interest. Under what he called the "buried fact doctrine", Judge Masterson found that facts set out in explanatory material were inadequately disclosed for purposes of § 14(a) since their importance made requisite a more prominent location.

These concepts of "similar emphasis" and "buried facts" are pertinent to this case. Although the conflict herein is not between the two merging companies, nonetheless there are conflicts which should be disclosed. The alleged discrimination in the instant case is between the favored defendants and the remaining shareholders, and this is precisely the issue upon which the three directors have conflicting interests. Thus, when the proxy statement describes the dual treatment and emphasizes the McLean board's unanimous approval of the merger, these directors are endorsing the differential payment for which they and their companies were responsible. In Beatty v. Bright, 318 F.Supp. 169 (S.D. Iowa 1970), the court found an inadequately disclosed conflict of interest and granted summary judgment on the basis of the board of directors' proxy recommendation of merger terms which would have extinguished their potential lia-

bility of two million dollars in suits against them as directors without disclosing this potential liability in the proxy materials. While not as blatant, nevertheless, Casey, Kroeger and Ludwig had conflicting interests of a personal nature similar to the *Beatty* case since their corporations, the favored defendants, had insisted on separate terms.[16] Those interests should have been specifically set forth.

The various facts listed previously which the defendants contend adequately reveal any conflict are interspersed throughout the proxy materials and could be gleaned only through a close and prolonged perusal. Under the buried facts doctrine, such disclosures are insufficient. Since the board stressed on several occasions its recommendation favoring the merger, it should have given similar emphasis to the compromised positions of Casey, Kroeger and Ludwig. The failure to do so is a material defect.

■ In support of the second contention, the plaintiffs argue that the fact that Mr. McLean negotiated for both the favored defendants and the remaining stockholders should have been stated in the proxy materials, and that the materials are false and misleading when they state "Reynolds has negotiated agreements to purchase [their stock] from [the favored corporate defendants]," (McLean's Letter, p. 1). The defendants contend that (a) Mr. McLean had no conflict of interest between himself and the non-favored shareholders so no disclosure was necessary, (b) the proxy statement does not state "face-to-face negotiations with the cash sellers" took place, and (c) Mr. McLean was acting merely as a go-between for these purchase agreements.

The facts are clear. In response to interrogatories, the favored defendants admitted that no officer, director or employee of theirs negotiated with any officer, director or employee of Reynolds with respect to the agreements to purchase their shares for cash. (Favored Defendants responses to Question 27 of the Plaintiffs Second Set of Interrogatories). Malcolm McLean in his deposition testified he acted for, at least, Mr. Ludwig and Mr. Kroeger in dealing with Reynolds. (McLean Deposition, pp. 5–6). Further, as is indicated throughout the depositions and affidavits of the several defendant directors of McLeans, Malcolm McLean initiated and handled the merger negotiations for all of the McLean shareholders. Communications regarding the willingness of the favored defendants to accept cash or Reynolds stock and the amount demanded were between Malcolm McLean and Ludwig, Casey and Kroeger. (McLean Affidavit, par. 17; McLean Deposition, p. 6; Ludwig Deposition, pp. 10–17, 36; Casey Deposition, pp. 20–24).

It is also clear that Malcolm McLean's representation of both the favored defendants and the remaining shareholders was not disclosed in the proxy statement. If anything, the statement that Reynolds negotiated with the favored defendants implies to the contrary that the cash purchase agreements were entered into through separate negotiations between Reynolds and the favored defendants. For much the same reasons that the veto power should have been disclosed, the proxy statement should have stated the actual role played by Malcolm McLean in the negotiations. After the initial Reynolds offer fell through and it became apparent that Reynolds would not agree to purchase all

16. The defendants argue that their after taxes net receipt for the McLean shares was less than the market value of the Reynolds shares received by the remaining shareholders. (Defendant's Brief—2nd Summary Judgment Motion pp. 6–10). This fact they argue indicates no conflict existed except perhaps one *favoring* the

remaining shareholders. Putting aside the obvious fact that after tax net value is quite different than pre-tax gross value, the Court reiterates its position that stock to be issued sometime in the future and a sum certain cash are two inherently different things, and that a conflict exists because of this difference.

of the McLean shares for $50 per share, Mr. McLean was representing common shareholders with conflicting interests. The favored defendants were adamant in their insistence upon the receipt of $50. Since they had an effective veto power over the merger, Mr. McLean was obliged to attempt to obtain whatever he could for the remaining shareholders subject to the favored defendants inflexible demand. Such a bargaining position necessarily limited Mr. McLean's advocacy of the non-favored defendants. Although it is entirely possible that Mr. McLean could have obtained compensation for the remaining shareholders which exceeded the $50 which the favored defendants would receive, he was representing two conflicting interests and such a dual representation should have been adequately disclosed. Any shareholder evaluating the merger offer would be concerned by the strong probability of bargaining tradeoffs undoubtedly requisite in any merger negotiation. When one bargaining agent negotiates for two interests, one of which has demanded a specific sum, these tradeoffs must come at the expense of the second interest. It makes no difference that Malcolm McLean himself was a member of this second class. Since it is the individual stockholder who is protected by § 14(a), it is that stockholder who must be sufficiently informed to decide how to vote. Therefore, the Court concludes that the proxy materials are materially defective for their failure to disclose Mr. McLean's role in the negotiations.

### D. THE MISSTATEMENT REGARDING THE TAX CONSEQUENCES OF THE MERGER:

The present factual status of this alleged misrepresentation is, if anything, less favorable to the plaintiffs than at the time of the last opinion.[17] The Court is of the opinion that summary judgment is not appropriate on the issue of the materiality of any misstatements concerning Monroe's tax status when considered alone.

### E. THE RELATIONSHIPS OF THE ALLEGED MISSTATEMENTS AND OMISSIONS:

Having concluded that the McLean proxy statement was materially defective in four respects, it is not requisite that the Court determine the cumulative materiality of the several misrepresentations and omissions.[18] However, the Court is of the opinion that the aggregate effect of the various misrepresentations most clearly evidences their materiality.

The Court has repeatedly cited the importance it ascribes to an accurate representation of the dual treatment afforded the favored defendants and the remaining shareholders and the actual status of the former in the McLean-Reynolds merger. The basic thesis behind all of the plaintiffs' alleged misrepresentations is that the proxy materials are misleading by their failure to adequately inform the plaintiffs regarding these two interrelated matters. The fashion in which each of the separate misrepresentations or omissions would mislead the shareholder has been adequately discussed. Their cumulative effect serves to significantly distort the actual status of the favored defendants and the merger negotiations. The factual misstatements are all highlighted by their inclusion in the letter which accompanied the proxy statement. The omissions should have been similarly revealed in the letter or in an equally conspicuous position. The statement regarding the agreement to vote will cre-

17. Defendants' answers to plaintiffs' second set of interrogatories indicate that Litton, American-Hawaiian and National Bulk did, in fact, pay substantial taxes on their receipt of $50 per share.

18. In its earlier opinion the Court stated that several omissions or misstatements not individually material might be material in the aggregate. This concept of cumulative materiality was accepted in Dillon v. Berg, 326 F.Supp. 1214 (D.C. Del.1971).

ate an initial inaccurate impression of the Reynolds-favored defendants purchase agreements. This impression is further distorted by the statement that Reynolds negotiated with the favored defendants and the failure to disclose Mr. McLean's role representing all common stockholders. The omission of any reference to the "veto power" makes impossible any assessment of the favored defendants commanding position and its probable effect on the bargaining process. Finally, the unqualified reference to the McLean Board's unanimous recommendation of the merger, without mention of the Ludwig et al. "conflict of interest," serves to compound the other misrepresentations and further obscure the status of the favored defendants. Revolving around the favored defendants merger role, the misstatements and omissions when aggregated would certainly be considered important by a reasonable shareholder when deciding how to vote and would, quite probably, have a significant propensity to affect the voting process. Therefore, since the Court finds that the effect of the four misrepresentations, whether individually or in aggregate, is material, the strict requirements of deciding the matter on summary judgment are met.

## F. THE LIABILITY OF THE VARIOUS DEFENDANTS:

Section 14(a) and Rule 14a–9 make it "unlawful for any person * * * to solicit or permit the use of his name to solicit any proxy [which is materially misleading]." Liability is predicated either upon the solicitation of proxies or permitting one's name to be used in soliciting proxies.

■■ Reynolds is the surviving corporation after the merger with McLean. As such, it possesses all rights and powers of McLean, as well as all liabilities and duties. See 8 Del.C. § 259 and Basch v. Talley Industries, Inc., 53 F.R.

D. 9 (S.D.N.Y.1971). Since McLean as issuer of the proxy statement is liable for any material misrepresentation, Reynolds as successor is also liable.[19]

■ The three defendant directors, Casey, Ludwig and Kroeger are also liable for their role in approving the proxy statement which they knew to be untrue. Each of the four material defects discussed previously was known to these defendants at least insofar as their respective corporations were concerned.

■ Malcolm P. McLean was definitely aware of the omissions of the veto power, the conflict of interest of Casey, et al., and his own role in the merger negotiations. Concerning the agreement, his dominant role in the merger negotiations imposed upon him a duty to obtain an accurate assessment of the status of the favored defendants. Therefore, he is, also, liable for approving the false proxy statement.

The remaining defendants may be categorized in two groups: (a) the remaining six directors of McLean (non-involved directors), and (b) Litton, Monroe, American-Hawaiian, and National Bulk (the favored corporate defendants). The Court is of the opinion that uncontroverted facts are not sufficiently developed to grant summary judgment against these defendants.

■ There has been no showing that the non-involved directors were aware that the statements held to be materially misleading were false. The plaintiffs have argued that these defendants are liable for negligence. See Myzel v. Fields, 386 F.2d 718, 734–735 (8th Cir. 1967), cert. den. 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143 (1968); and Vanderboom v. Sexton, 422 F.2d 1233 (8th Cir. 1970). The Court is unwilling at this stage to rule that scienter is irrelevant in a suit for personal liability against individual directors. Regarding the agreement to vote, while the approval of the proxy statement by Casey,

---

19. Since the Court has held Reynolds liable as McLean's successor, it need not decide Reynolds' alleged liability under plaintiffs' *Baldwin-Monroe* joint proxy statement theory.

Ludwig and Kroeger does not create a binding agreement to vote, it may be sufficient to relieve the non-involved directors from liability for negligent approval of a misleading proxy statement. Further, in the presence of Casey, et al., Mr. McLean stated during the McLean board meeting at which the merger was initially approved that Reynolds had negotiated with the favored defendants. These factors may not absolve the non-involved defendants from liability, however, the present record does not adequately disclose the extent to which these directors were aware of the actual status of the merger or any efforts made by said defendants to ascertain this status outside mere acceptance of the representations of Malcolm McLean, Casey, Kroeger and Ludwig.

The Court does not intend here to establish the appropriate standard applicable to the non-involved directors, and it does not suggest that by remaining ignorant of corporate affairs, a director may immunize himself of any liability under § 14(a). The directors owed a fiduciary duty to McLean and the plaintiffs' class. Certainly if any individual is to police the solicitation of proxies and the actions of those directly involved in the negotiations of mergers, it must be non-involved directors as in this case. This fact may impose a substantial obligation. However, no evidence is presently before the Court upon which the Court can fairly evaluate the non-involved directors fulfillment of their responsibilities.

The possible liability of the favored corporate defendants is also not sufficiently established on the present record. The plaintiffs have argued that by acceptance of the benefits procured by the actions of their agents, Casey et al., the favored defendants are liable for the proxy misrepresentations. The Court is of the opinion that the favored corporate defendants' liability is dependent upon several issues of fact which under the standards for summary judgment, the plaintiffs have not adequately shown. In their answers to the plaintiffs' amended complaint, the favored corporate defendants expressly denied the allegation that they participated in the preparation and issuance of the McLean proxy statement. (Favored Defendants' Answers to Paragraph 39 of the Complaint). They, also, denied that Casey, Ludwig, and Kroeger respectively represented them on the McLean Board (Answers to Paragraphs 10 and 11 of the Complaint). Thus, while apparently the three directors were the primary if not sole contacts between their respective companies and Mr. McLean, there remain questions of agency and authority, real or apparent, which must be answered before liability is established. Although the Litton-National Bulk group has not argued the non-representation issue in their briefs the Court senses that this failure was most likely an effort to present a united front against the plaintiffs' motion for summary judgment, and not an abandonment of their previous answers. If sufficient facts can be elicited to demonstrate the favored corporate defendants' responsibility for the proxy solicitation through the acts of their agents, then they will be liable. Presently, summary judgment against these defendants must be denied.

The Court is not unmindful of the fact that it is often easy to disect proxy statements after the fact to reveal slight errors or insignificant omissions. Nonetheless, § 14(a)'s requirements, emphasizing effective and informed exercise of the shareholder franchise, mandate a finding of summary judgment herein. The Court has been faced solely with the issue of § 14(a) requirements and liability thereunder, and not been concerned with the substance of the McLean-Reynolds merger. Nothing contained herein questions the fairness of the merger terms or the legality of any premium payments. These are not matters for debate regarding liability under § 14(a), and should be raised regarding the calculation of damages, if any. Partial summary judgment on the issue of liability pursuant to § 14(a) of the Securities Exchange Act will be entered

against the R. J. Reynolds Tobacco Company, Malcolm P. McLean, Joseph T. Casey, Hal A. Kroeger and Daniel K. Ludwig, and summary judgment against the other defendants or the plaintiff will be denied.

Submit order in accordance herewith.