Raymond G. PERELMAN

v.

The PENNSYLVANIA REAL ESTATE INVESTMENT TRUST et al.

Civ. A. No. 74–1413.

United States District Court, E. D. Pennsylvania.

June 15, 1977.

Arlen Specter, Robert C. Heim, of Dechert, Price & Rhoads, Philadelphia, Pa., for plaintiff.

Thomas A. Masterson, Joseph A. Torregrossa, of Morgan, Lewis & Bockius, Philadelphia, Pa., for defendants Cohen, Orleans, Kravitz, Bechtel, Bergman, Farber & Korman.

Patrick W. Kittredge, of Cohen, Shapiro, Polisher, Shiekman & Cohen, Philadelphia, Pa., for defendant Pa. Real Estate Inv. Trust.

Steven A. Arbittier, Philadelphia, Pa., for defendants FPA, M. A. Kravitz Co., Inc. and Mid-Island.

## OPINION

GORBEY, District Judge.

In this derivative action filed by plaintiff on June 6, 1974, on behalf of The Pennsylvania Real Estate Investment Trust ("PREIT") and its holders of Certificates of Beneficial Interest, plaintiff contends that defendants violated the federal securities laws and state law with respect to two transactions. The corporate defendants are FPA Corporation, of which the defendant Marvin Orleans is Chairman of the Board and President who "bought control of the company in July of 1965"; Mid-Island Properties, Inc. ("Mid-Island"), a corporation all of whose stocks are owned by the defendant Morris Kravitz and his family. (Exhibit 1, plaintiff's reply memorandum in support of

his motion for partial summary judgment.) Defendant Marvin Orleans is a Trustee of PREIT as is the defendant Morris Kravitz. The remaining individual defendants are Trustees of PREIT but own no stock in either of the corporate defendants. The defendant Sylvan Cohen, a Trustee of PREIT, is also a Director of the FPA Corporation.

The plaintiff, a holder of 2% of the shares of PREIT, served as a Trustee until 1973.

The plaintiff contends and defendants deny that they violated § 14(a) of the Securities Exchange Act of 1934 and Rule 14a–9 promulgated thereunder with respect to the proxy statement disclosures pertaining to a PREIT–FPA Corporation transaction in Plantation City, Florida, and a PREIT-Mid-Island Properties, Inc. project involving the Cambridge Apartments in West Goshen Township, Pennsylvania.

Section 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(a) provides:

"It shall be unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, *in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors,* to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78*l* of this title." (Emphasis added)

Rule 14a–9(a) promulgated thereunder provides:

"No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading."

Before getting into specifics, it is pertinent to note that Section 14(a) of the Exchange Act was intended to promote the free exercise of the voting rights of stockholders by insuring their proxies would be solicited with explanation to the stockholder of the real nature of the questions for which authority to cast his vote is sought. *Mills v. Electric Auto-Lite Co.,* 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970). In the *Mills* case the Court held that there was no need to demonstrate that the alleged defect in the proxy statement actually had a decisive effect on the voting. So long as the misstatement or omission was material, the causal relation between violation and injury is sufficiently established if "the proxy solicitation itself . . . was an essential link in the accomplishment of the transaction". 396 U.S., at 385, 90 S.Ct., at 622. Later in *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 2133, 48 L.Ed.2d 757 (1976), the Court determined that:

"[T]he general standard of materiality that we think best comports with the policies of Rule 14a–9 is as follows: an omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote. This standard is fully consistent with *Mills* general description of materiality as a requirement that 'the defect have a significant *propensity* to affect the voting process.' It does not require proof of a substantial likelihood that disclosure of the omitted fact would have caused the reasonable investor to change his vote. What the standard does contemplate is a showing of a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder. Put another way, there must be a substantial likelihood that the disclosure

of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." 96 S.Ct. at 2133.

The 1973 proxy involved solicited votes to elect two trustees for a term of three years and until their successor shall have been elected and shall have qualified, the nominees being defendants Lloyd R. Bechtel and Jack Farber. With respect to the Pennsylvania transaction, the proxy statement says:

"The Trust's 50% partner in the partnership owning the Cambridge Apartments, West Goshen Township, Pennsylvania, is Mid-Island Properties, Inc. ("Mid-Island"), of which Morris A. Kravitz, a Trustee, is President. The Trust for its 50% interest invested $275,000 in the development of this property for which it receives 10% per annum of its original capital investment as a guaranteed payment. The Partnership Agreement as amended provides among other things that after the Trust receives its guaranteed payment each year, Mid-Island is to receive an amount equal to the Trust's distribution plus any amount it was required to pay to the Managing Agent, with the balance of the cash flow being distributed 70% to the Mid-Island and 30% to the Trust and that upon the sale or other distribution of the property, the Trust is to receive its capital investment of $275,000, Mid-Island is to receive its capital investment in the project, and any excess to be equally divided between the parties."

The plaintiff contends that the aforementioned statement violates Rule 14a–9(a) because it "fails to disclose the change in the cash flow distribution which had been orchestrated after Morris Kravitz' company, Mid-Island Properties, Inc., emerged as PREIT's partner". It appears that originally a deal involving the Cambridge Apartments was covered by an agreement dated June 13, 1967, in which PREIT and one Murray Eisman, the son-in-law of Morris Kravitz, were parties. That agreement gave PREIT preferential distribution of $27,500 per year until the apartments were complete. Eisman received the next $27,-500 and the remaining cash flow was to be distributed on a fifty-fifty basis. (Exhibit D, plaintiff's memorandum.) Pursuant to the partnership agreement, PREIT had advanced the sum of $275,000.

"[I]t became clear that the development seemed doomed to failure under Eisman's leadership. As a result, the Trust stood to lose its $275,000 investment. In order to save the deal, Morris Kravitz infused a substantial amount of money (at least $675,000) to see to the completion of the apartments and arranged to substitute Mid-Island Properties, Inc., a solid financial partner, in place of the failing Eisman. As a result of Kravitz' action, the deal was saved from disaster. In consideration for Kravitz' substantial infusion of money into the deal and the substitution of Mid-Island for Eisman, the cash flow distribution in question was amended. As is evident, Kravtiz' action conferred substantial benefits upon the Trust."

(Defendants' Memorandum in Opposition to Plaintiff's Motion, pp. 11, 12, Docket Entry 152.)

Plaintiff points out that by virtue of a surety agreement made in connection with the original partnership agreement defendant, Morris A. Kravitz, became surety for Eisman for the prompt and faithful performance of all of the obligations required to be performed by Eisman for final completion of all the apartment units (both First Phase and Second Phase) within the times and in the manner set forth in Article 5 of the partnership agreement.

The surety agreement further provides specifically:

"A. Surety and Eisman do hereby assume and agree to pay to

(i) Partnership all capital required to be contributed to the Partnership by Eisman pursuant to § 403 of the Partnership Agreement;

(ii) PREIT all sums advanced by PREIT upon the failure of Eisman so

to do under § 403 of the Partnership Agreement;

(iii) PREIT all sums required to be paid to PREIT by the partnership pursuant to Article VI of the Partnership Agreement;

(iv) PREIT all of the capital withdrawal to which PREIT is entitled pursuant to § 701 of the Partnership Agreement."

In short Mr. Kravitz assumed Eisman's financial responsibility under the terms of the partnership agreement. Therefore, financial contributions in support of the partnership endeavor were contributions which he was already legally bound to make as surety for Mr. Eisman. At this point it must be noted specifically that the agreement which let Eisman out of the partnership brought in a substantial corporation, Mid-Island Properties, Inc., which is a family corporation owned and controlled by Morris A. Kravitz. Thus when Mid-Island assumed Eisman's obligations it was in effect Kravitz' assumption of the obligation which had already been created upon him personally by the surety agreement. It is therefore apparent that Mr. Kravitz as owner of Mid-Island Properties, Inc. obtains the potential benefit of the change of a fifty-fifty distribution to a 70% share. (Sections 301 and 803(iv) of the Partnership Agreement, Exhibit D of Plaintiff's Memorandum.) "Section 803(iv) of the Partnership Agreement is amended to provide that after distribution of the cash flow referred to in Sections (i), (ii), and (iii) of Section 803 thereof, thirty percent (30%) of the remaining cash flow distributed for the balance of the current calendar year shall be paid to PREIT and seventy percent (70%) of the remaining cash flow shall be paid to Mid-Island."

While the 1973 proxy statement stated that Morris A. Kravitz, Trustee of PREIT, was President of Mid-Island Properties, Inc., it did not state that he was also sole owner of said corporation. Likewise it did not state that the original agreement called for a cash flow distribution of 50% to each of the partners. And it is equally obvious that there was no explanation as to why the Trustees voted for a change in the partnership agreement to confer the 20% benefit on a wholly-owned corporation of the Trustee, Morris A. Kravitz. It would appear logical to conclude that shareholders of PREIT would be entitled to a full disclosure of all the facts in order to enable them to make an intelligent determination with respect to the corporate nominees, defendants Lloyd R. Bechtel and Jack Farber. The significance of the failure to reveal all the facts in the proxy statement is emphasized by the fact that plaintiff Perelman submitted to the Trustees a proposal to create a special five person committee to "investigate all transactions between the Trustees and the Trust". With respect to the three proposals which would be submitted to the shareholders for their vote at the annual meeting the proxy statement contained the following: "If these proposals are submitted for a shareholder vote at the annual meeting, it is the intention of the proxies to vote against their adoption".

The plaintiff points out at page 10 of his memorandum that a disclosure of the 20% change in the cash flow was first made in the 1975 proxy statement. In number 11 of PREIT's answers to plaintiff's second set of interrogatories PREIT gave the following as a reason:

"Timothy M. Hardin of the Division of Corporation Finance, Securities and Exchange Commission and Aldis Lapins, Esquire, Washington Regional Office, Securities and Exchange Commission, commented orally to Richard B. Pearl, Esquire, counsel for PREIT, that it was their opinion that the 1975 proxy statement referring to the Cambridge Apartments should contain a reference to the original terms of the Partnership Agreement and the changes reflected in the April, 1970 and September, 1971 amendments thereto."

If the disclosure was legally relevant in 1975, it most certainly was relevant in 1973. But, as previously indicated, that disclosure is not sufficient. It leaves out the details which would make it possible for a

reasonable shareholder to assess properly a Trustee's sense of fiduciary responsibility in conflict of interest situations involving insider trustees, or as stated by plaintiff at pages 15–16 of his memorandum "[a] reasonable shareholder also would have wanted to know whether the stewardship of all the trustees, whether or not a particular trustee was standing for election, was faithful to the shareholders or constituted a betrayal of the trustees' fiduciary obligations." But, if Schedule 14A, promulgated by the SEC, does not require the revelation of such information, failure to provide it cannot be regarded as a violation of the Act. There is no contention that defendants failed to comply with that schedule. If such information is not required, material as it may seem, it could be that fiduciary standards and alleged violations thereof are issues more properly litigated in the state courts. Defendants argue that "Not only were the proxy rules not designed to establish fiduciary standards, but they were also not designed to provide a federal forum to litigate difficult state law questions."

The absence of consideration for the change with respect to cash flow in the April 10, 1970 agreements is not cured by the fact that in October, 1970, by Supplement III to the Cambridge Arms Agreement, PREIT secured a guaranteed return on its investment.

The full extent of the surety obligation resting upon Morris A. Kravitz as a result of the surety agreement of June 13, 1967 is made perfectly clear in III A (vii) which reads as follows:

"At all times prior to final completion of all apartment units to be constructed under the terms of the Partnership Agreement (First Phase and Second Phase), Surety shall be bound by each and every covenant, obligation, power and authorization, without limitation, in the said Partnership Agreement, with the same force and effect as if Surety is designated in and as if Surety had executed said Partnership Agreement as a Partner, jointly and severally, with, or in the place of, and instead of Eisman."

Thus, as respects PREIT and Kravitz, the result of the April 10, 1970 agreement is that Kravitz reaps a 20% increase in the cash flow distribution with no increase whatever with regard to his obligations to PREIT. Paragraph 12 of the agreement specifically provides:

"Kravitz does hereby agree that the terms and provisions of the Surety Agreement and Agreement to Purchase dated June 13, 1967, and the Surety Agreement dated December 16, 1968, shall remain in full force and effect."

In determining whether to return management or a portion of management as Trustees of PREIT, complete and accurate information with respect to insider transactions, transactions involving a conflict of interest, full and complete disclosure is as essential, if the Act requires it, when the transaction involved is the election of Trustees as it is where the transaction involves a proposed merger, such as that involved in *TSC Industries, Inc. v. Northway, Inc.*, *supra*.

The court's interpretation of the relevant contracts and the 1973 proxy statement could support the conclusion that material facts were omitted and that the defect had a significant propensity to affect the voting process. Stated differently, a jury could find that the omitted facts were material because there is a substantial likelihood that a reasonable shareholder would consider such facts as important in deciding how to vote.

To the court's statement in *SEC v. Kalvex, Inc.*, that "one does not elect as a director an individual who is using the corporation he represents for personal gains", may be added the additional statement that one does not elect as a trustee or director an individual *who knows, or should know*,[1] that other directors or trustees are using

---

[1] "The issue of materiality, resting as it does upon what is believed would be the reaction of a 'reasonable shareholder', is a mixed question of law and fact and the subsidiary fact issues cannot ordinarily be decided by summary judgment". *Gould v. American-Hawaiian S.S. Co.*, 535 F.2d 761, 771 (3d Cir. 1976).

the corporation for a personal gain and vote in favor of such transactions, or, raise no objection to such transactions. *SEC v. Kalvex, Inc.*, 1975–76 CCH Fed.Sec.L.Rep. ¶ 95,226 at p. 98187 (S.D.N.Y.1975).

We are reminded that "Doubts as to the critical nature of information misstated or omitted will be commonplace. And particularly in view of the prophylactic purpose of the Rule and the fact that the content of the proxy statement is within management's control, it is appropriate that these doubts be resolved in favor of those the statute is designed to protect. *Mills, supra,* [396 U.S.] at 385, 90 S.Ct., at 622.". *TSC Industries, Inc. v. Northway, Inc.*, 96 S.Ct. at 2132.

Assuming, arguendo, the materiality of the omitted facts as a matter of law, it becomes necessary to determine whether or not defendants were legally obligated to include such facts in the proxy statement.

It is to be noted that plaintiff does not claim that there were false or misleading statements of material facts to be found in the proxy statement; the position taken is that the violation of § 14(a) and Rule 14a–9(a) resulted from the *omission* of material facts; there is no contention by plaintiff that the inclusion of those facts would be necessary in order to make statements therein not false or misleading. Rule 14a–9(a) in relevant part states that:

"(a) No solicitation subject to this regulation shall be made by means of any proxy statement . . . which . . . is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading . . . ."

When all the facts pertaining to the Cambridge Apartments project as recited in the proxy statement are considered, it is perfectly obvious that the omissions relied on do not make any of those statements false or misleading. Accordingly, Rule 14a–9(a) has not been violated; therefore, plaintiff's motion for summary judgment with respect to the Cambridge Apartment project must be denied with the observation that:

"Corporations are creatures of state law, and investors commit their funds to corporate directors on the understanding that, except where federal law expressly requires certain responsibilities of directors with respect to stockholders, state law will govern the internal affairs of the corporation."

*Cort v. Ash*, 422 U.S. 66, 84, 95 S.Ct. 2080, 2091, 45 L.Ed.2d 26 (1975).

The court also agrees with the position taken at pages 3 and 4 of the memorandum submitted by corporate defendant, PREIT, that equally applicable to § 14(a) and Rule 14a–9 is the conclusion of the Supreme Court with respect to § 10(b) of the Securities Exchange Act of 1934: "Congress by § 10(b) did not seek to regulate transactions which constitute no more than internal corporate mismanagement". *Superintendent of Insurance v. Bankers Life & Cas. Co.*, 404 U.S. 6, 12, 92 S.Ct. 165, 169, 30 L.Ed.2d 128 (1971); *Santa Fe Industries, Inc. v. Green*, —— U.S. ——, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977).

The conclusion reached in the case *sub judice* is supported by *Ash v. Brunswick Corporation*, 405 F.Supp. 234 (D.Del.1975), a case which deals specifically with the problem, and holds that omissions constitute violations of the Act only if they are both material and make other statements false or misleading. This decision finds support in such cases as *General Time Corporation v. Talley Industries, Inc.*, 403 F.2d 159, 162 (2d Cir. 1968), *cert. denied*, 393 U.S. 1026, 89 S.Ct. 631, 21 L.Ed.2d 570 (1969), in which the court made the statement: "We fail to see how the details concerning the discussions between Industries and Fund that were omitted from the proxy statement were 'necessary in order to make the statements therein not false or misleading.' "; *Rosenblatt v. Northwest Airlines, Inc.*, 435 F.2d 1121, 1128 (2d Cir. 1970) where the court wrote: "Mere failure to say everything on this score that opponents of the merger would have wished is not such an omission 'to state any material fact neces-

sary in order to make the statements therein not false or misleading' under Rule 14a–9 . . . "; *Gould v. American Hawaiian Steamship Company*, 351 F.Supp. 853, 866 (D.Del.1972), a case in which the court on appeal was affirmed in part and reversed in part and the case remanded, *Gould v. American Hawaiian S. S. Co.*, 535 F.2d 761 (3d Cir. 1976); *C M C Corporation v. Kern County Land Company*, 290 F.Supp. 695, 696 (N.D.Cal.1968) where the court observed that "Plaintiffs' allegation that the Kern Proxy Statement omitted to state the fair market value and/or estimates of the fair market value of the Kern assets does not set forth facts sufficient to show that such omission was of a *material fact necessary, in the light of the circumstances, to make other statements in the proxy statement not misleading* . . . " (Emphasis supplied)  See also the earliest case of *Gould v. American Hawaiian Steamship Company*, 331 F.Supp. 981, at page 986 (D.Del.1971) where the court stated:

> "The issues here are identical to those presented in the former motion for summary judgment; (1) whether the attacked statements in the McLean proxy materials are false and misleading or the alleged omissions are necessary in order to make the statements made not false and misleading;  and (2) whether the misstatements or omissions are 'material.'"

*See also Materiality in the Use of SEC Forms* in Volume 32 No. 3, April, 1977, of *The Business Lawyer* in which the authors of the article approved the decision in the Ash case and conclude that:

> "[I]f a contrary view were correct, no lawyer could be sure that he has complied with the Federal Securities laws when he prepared filings required by the SEC.  In addition, the use of SEC short forms would be difficult to justify without such a position."

The authors also point out that the decision is consistent with the position taken by the SEC in a brief filed with the Supreme Court in *TSC Industries, Inc. v. Northway, supra.*

Next to be considered is plaintiff's contention that defendants violated § 14(a) of the Securities Exchange Act of 1934 and Rule 14a–9 promulgated thereunder, by failing to disclose the following items in the proxy statement of the Pennsylvania Real Estate Investment Trust concerning the PREIT–FPA Corporation transaction in Plantation City, Florida:  (a) Sylvan Cohen's shareholdings in FPA Corporation; (b) the change from 15% to 10% in the interest rate on the transaction and the reasons for the change;  (c) Sylvan Cohen, who negotiated for PREIT, had a financial interest in both sides of the transaction;  (d) the lack of prior approval by the Board of Trustees of PREIT for the change in interest rate from 15% to 10%;  (e) the fact that the law firm of Cohen, Shapiro, Polisher, Shiekman & Cohen, of which Sylvan Cohen is a senior partner, is general counsel to FPA Corporation and the amount of fees received from FPA.

With respect to plaintiff's motion for summary judgment, it is apparent that the significance of three omissions depends upon his ability to establish the accuracy of the second and fourth.  The fact that Sylvan Cohen was a holder of 1% of the total outstanding shares of FPA Corporation, had a financial interest in both sides of the transaction, and that Mr. Cohen's law firm is general counsel to FPA are not material as a matter of law if the record reveals that there was not a contractual change in FPA's obligation to pay interest to PREIT from 15% to 10%.

The Minutes of PREIT's Board of Trustees Meeting of May 15, 1972 gave the details of the proposed investment in the Plantation City, Florida enterprise.  It is stated that:

> "PREIT's involvement in the project will be a guaranteed loan bearing interest at the rate of 15% per annum subordinated to a first mortgage and with a fixed term of repayment to be negotiated by the Property Committee but not to exceed seven years."

There was a discussion of the loan transaction after which:

> "Upon motion duly made, seconded and carried, it was:

RESOLVED, That the Pennsylvania Real Estate Investment Trust ('PREIT') be and hereby is authorized to enter into loan agreements with a joint venture of FPA Corporation, a Delaware corporation, and a corporation controlled by Sanford Rissman, for the development of a condominium project in Plantation, Broward County, Florida, whereby PREIT will loan to said joint venture, for a term of no more than seven years an amount not to exceed $800,000 at any one time during the term of the loan, said loan be guaranteed as to payment of principal and interest by FPA Corporation and subordinated only to a first mortgage of record, and with such other terms and conditions as may be negotiated by the Property Committee; and

FURTHER RESOLVED, That any two Trustees be and they hereby are authorized, empowered, and directed, to enter into, to execute on behalf of PREIT and to deliver for recording, all such agreements, certificates, instruments or documents and to do or cause to be done all such further acts and things determined to be necessary or advisable to effect the foregoing resolution, and the execution by any two Trustees of any such agreements, certificates, instruments, or documents or the doing of any such act or things shall be conclusive evidence of a determination in that respect and approval thereof."

The Minutes duly reflect that Marvin Orleans, who had majority control of FPA Corporation, and Sylvan M. Cohen abstained from voting on the above resolutions. (Exhibit C, Plaintiff's Motion for Partial Summary Judgment).

Turning now to the Minutes of the FPA Corporation Board Meeting of June 14, 1972, it is stated that:

"The proposed agreement would require that PREIT provide up to $800,000 of initial financing for the project repayable over a five-year term or upon completion, whichever occurs first, at an interest rate of 15%, to be secured by a mortgage lien which is to be subordinated to construction financing. Prior to expiration of the five-year term, payments of principal are only to be made from profits."

Thereafter:

"Upon motion duly made, seconded and approved, it was unanimously (Marvin Orleans and Sylvan M. Cohen abstaining):

RESOLVED, That FPA Corporation enter into an arrangement with Sanford and Rainey Rissman ('Rissmans') and Pennsylvania Real Estate Investment Trust . . . (b) PREIT will provide, as a loan, initial equity-type five-year term financing of up to $800,000 at an interest rate of 15% with a mortgage on the premises to be subordinated to construction financing, . . . and

FURTHER RESOLVED, That the President and any Vice President be and hereby is authorized to do any and all things necessary to effectuate the purposes of the above resolution and amend the terms of the arrangement to the extent necessary to carry out the general purposes thereof, and all officers of this Corporation be and hereby are, and each of them is, authorized to execute any and all documentation necessary to effectuate the transactions."

(Exhibit B to Plaintiff's Motion for Partial Summary Judgment).

Thus it appears that at the time of the resolutions of the respective corporations, the 15% interest charge was discussed and approved, but the resolutions adopted at each corporate meeting do not provide that the agreement later to be negotiated must carry a 15% interest charge. The resolution of PREIT specified no specific interest charge and while the resolution of FPA Corporation included an interest rate of 15%, a second resolution authorized the President and any Vice-President to "amend the terms of the arrangement to the extent necessary to carry out the general purposes thereof". It is obvious therefore that the corporate officers of each company expected further negotiation as a result of which changes could be made including a change in the previously discussed

interest rate, which is exactly what happened.

Exhibit 3 to Plaintiff's Reply Memorandum is a letter from an attorney representing FPA Corporation to the defendant Sylvan M. Cohen and Cohen, Shapiro, Polisher, Shiekman & Cohen, in which he made certain recommendations including one to reduce the 15% per annum interest charge to something less than 10% and giving what appears to be reasonable and logical reasons for the suggested changes.[2] Exhibit 3 to Plaintiff's Reply Memorandum is a letter written by the Cohen law firm to Mr. Clark in which he responded affirmatively to the proposed changes and assented to the 10% interest charge. Thus it was that when the transaction was consummated finally by an agreement dated August 18, 1972, the contract came into existence establishing the 10% interest charge.

■ The established omissions are not so obviously important to an investor, that reasonable minds cannot differ on the question of materiality, therefore the question is obviously for a jury. Accordingly, plaintiff's motion for summary judgment with respect to the Plantation, Florida transaction must be denied.

It must be noted, however, that even if it be assumed that the omitted facts are material, that would not help the plaintiff, for, as previously determined, the plaintiff would be required to show that the omissions related to material facts necessary to be stated "in order to make the statements therein not false or misleading". The court's reading of the proxy statement reveals no statements therein which are either false or misleading in the absence of the omitted facts.

2. The negotiations between the parties are shown at pages 5–8 of the memorandum in behalf of the individual defendants and which refer to portions of relevant depositions.

3. Plaintiff sought the following relief to remedy the alleged violations of the Act: (1) Require disclosure of all items listed; (2) Rescission of and declaration that the election of each trustee who stood for election during the period November, 1970 to date is null and void. It is, therefore, unnecessary to discuss the showing of culpability required to establish liability un-

As respects the corporate defendants, FPA Corporation and Mid-Island Properties, Inc., there is no liability. Plaintiff's motion is based entirely upon the alleged failure to disclose certain items in the proxy statements of PREIT. There is nothing in the record which would require the conclusion, as a matter of fact or law, that the corporate defendants were involved in the preparation of the proxy statements.[3]

### ORDER

AND NOW, this 15th day of June, 1977, upon consideration of plaintiff's motion for partial summary judgment, the memoranda in support of and in opposition thereto, and for the reasons given in the accompanying Opinion, it is ORDERED that said motion be and is hereby DENIED.

der § 14(a) of a corporation issuing a materially misleading proxy statement, or of a person involved in the preparation of a materially misleading proxy statement.

The court's decision makes it unnecessary to determine the appropriateness of the relief requested, as to which see: *Mills v. Electric Auto-Lite Co.,* 396 U.S. 375, 386, 90 S.Ct. 616, 626, 24 L.Ed.2d (1970); *Rafal v. Geneen,* 172–73 CCH Fed.Sec.L.Rep. ¶ 93,505 (E.D.Pa.1972).