Abraham L. SHAPIRO et al.

v.

BELMONT INDUSTRIES, INC. et al.

Civ. A. No. 77–1347.

United States District Court,
E. D. Pennsylvania.

Sept. 30, 1977.

John Francis Gough, White & Williams, William O. Evans, Richard M. Jordan, Philadelphia, Pa., for plaintiffs.

Arlen Specter, Dechert, Price & Rhoads, Bernard S. Bergman, Philadelphia, Pa., for defendants.

## MEMORANDUM AND ORDER INCLUDING FINDINGS OF FACT AND CONCLUSIONS OF LAW

VanARTSDALEN, District Judge.

### I.

This lawsuit arises out of alleged violations of the "truth-in-proxy" provisions of

the Securities and Exchange Act of 1934 and the administrative regulations thereunder governing the solicitation of corporate proxies. 15 U.S.C. § 78n(a); 17 CFR § 240.-14a–9. Certain pendent claims premised upon Pennsylvania corporation law have also been alleged. For the reasons that follow, judgment will be entered as to all claims in favor of defendants.

■ Plaintiffs are seven minority shareholders of the corporate defendant Belmont Industries, Inc. (Belmont), collectively owning or controlling approximately 30 percent of Belmont's outstanding voting stock. The defendants, in addition to Belmont, include certain past and present Belmont directors some of whom are also Belmont officers and/or shareholders. The issues focus upon management's proxy solicitation statement dated and mailed to Belmont shareholders March 18, 1977 and certain events preceding such proxy statement. The complaint was filed April 18, 1977 and on the same day the court denied plaintiffs' application for a temporary restraining order to enjoin the annual meeting of Belmont shareholders scheduled for April 19, 1977. Expedited discovery and further hearings having taken place, the parties have submitted the case to the court for final disposition on the present record. To the extent I am required by Fed.R.Civ.P. 52(b) to make written Findings of Fact and Conclusions of Law, convenience and ease of understanding suggest these Findings and Conclusions be styled in narrative form.[1]

## II.

Belmont is a Pennsylvania corporation with its principal place of business in Philadelphia. The corporation itself engages in no manufacturing, distributing, or service-related activity, but rather operates through certain owned or controlled subsidiary corporations. Belmont is a publicly-owned company having more than 300

shareholders and as such is a "reporting company" required to make filings with the Securities and Exchange Commission (SEC), including the filing of any proxy solicitation statement. 15 U.S.C. §§ 78m, o (d). The plaintiffs are individual shareholders who collectively own or control about 30 per cent of Belmont's outstanding voting stock. The individually named defendants are present or former directors of Belmont, some of whom are also officers and/or shareholders themselves. Prior to March, 1977, the Board of Directors of Belmont (Board, or Board of Directors) consisted of 12 directors composed of three separate classes: Class A, whose four members' terms expired in 1977; Class B, whose four members' terms expire in 1978; and Class C, whose four members' terms expire in 1979. On February 22, 1977, the Board of Directors held a meeting at Belmont's executive offices in Philadelphia, at which a quorum of the directors was present. At the meeting, the Board unanimously resolved that the annual shareholders meeting be held April 19, 1977, for the purpose, *inter alia,* of electing four Class A directors for three year terms. Further resolved was that Belmont's management would nominate for those Class A directorships the incumbent individuals whose Class A directorships were then expiring; in other words the Class A directors currently serving would be renominated to serve another term. By letter dated March 8, 1977, and addressed to Raymond G. Perelman (Ray Perelman), Chairman of the Board, Otto Pfeiffer (Pfeiffer), one of the incumbent Class A directors, requested that his name be withdrawn from nomination, citing health and family reasons. On March 11, 1977, Marvin Waspe (Waspe), also an incumbent Class A director to be renominated, telephoned Bernard S. Bergman (Bergman), Belmont's Secretary and General Counsel and also a director, and requested

---

1. The court has carefully examined and relied upon the pleadings, depositions, briefs, exhibits, and transcripts of oral argument of counsel, in reaching its findings and conclusions. It should be mentioned at the outset that, as in any civil litigation, the burden is upon the plaintiffs to prove by a preponderance of the evidence each and every element of any cause of action pleaded in the complaint or submitted to the court. The court has meticulously adhered to that standard in reaching its findings.

that his name be withdrawn from nomination, citing personal reasons. At that point in time, in connection with his normal duties as Secretary and General Counsel, Bergman was nearing the completion of the formal proxy statement required to be submitted to the SEC. Bergman, in conjunction with Ray Perelman and/or Ronald O. Perelman (Ron Perelman), Executive Vice-President of Belmont, or by himself, determined that there should be no replacement nominees for the Waspe and Pfeiffer directorships. Bergman prepared a Unanimous Consent dated March 11, 1977, which was circulated to and signed by each individual member of Belmont's Board. This action by unanimous consent of the Board[2] amended the Board's resolution of February 22, 1977, and reset the number of directors for the forthcoming year at ten. On or about March 18, 1977, a proxy solicitation statement was filed with the SEC and mailed to Belmont shareholders including the plaintiffs. This proxy statement was "furnished in connection with the solicitation by the management of Belmont . . of proxies to be used at the Annual Meeting . . . to be held . . . on April 19, 1977." The proxy statement set forth, *inter alia* :

> Pursuant to the By-Laws of the Corporation, there are three classes of Directors. At present there are twelve directors of the Corporation. The Board of Directors, by resolution of February 22, 1977 fixed the number of directors for the coming year at twelve. The terms for the existing Class "A" Directors expire in 1977. Messrs. Marvin E. Waspe, Leon J. Perelman, Otto Pfeiffer and Laurence R. Wiggins were nominated as Class "A" Directors for a three-year term expiring in 1980 at the Board of Directors meeting on February 22, 1977. However, on March 8, 1977 Mr. Otto Pfeiffer, citing health and family reasons, requested that his name be withdrawn from nomination and on March 11, 1977 Mr. Marvin E. Waspe, citing personal reasons, requested

that his name also be withdrawn from nomination. Management recommended to the Board of Directors that in view of the short time period between these notices and the April 19, 1977 Stockholders' Meeting there be no replacement nominees requested or designated; and by Unanimous Consent dated March 11, 1977 the Board of Directors reset the number of directors for the forthcoming year at ten. Both Messrs. Pfeiffer and Waspe indicated that they had no intention of resigning their other positions with the Company at this time.

Thus, through the retirement of Pfeiffer and Waspe, the Belmont Board had in effect reduced the number of total directorships to ten, and the number of Class A directorships up for election at the 1977 annual meeting of shareholders to two.

On April 18, 1977, plaintiffs' complaint was filed concurrently with an application for an order restraining the convocation of Belmont's annual meeting of shareholders to be held the next day. After discussion with all counsel in chambers and arguments made in open court of record, the court denied issuance of a temporary restraining order. However, the court did allow for a program of expedited discovery and set May 11, 1977 as the date for a hearing for preliminary injunctive relief. On April 19, 1977, the annual meeting of shareholders was held at which the two nominees of Belmont's management were elected to serve three year terms as Class A directors. Before the voting was officially tabulated and recorded, a representative of certain of the plaintiffs proposed a resolution that the meeting be adjourned pending the outcome of the present litigation. This request was put to a shareholder vote and defeated.

A hearing before the court was held on May 11, 1977, and through agreement of counsel, the case was thereupon submitted to the court for disposition upon the record as finally supplemented.

---

2. Section 3–7 of the corporate by-laws of Belmont permits the Board to take any action which it could take at a duly convened meeting of the Board by the alternate method of a unanimous signed written consent of the individual members of the Board.

### III.

Plaintiffs' complaint contains two counts, the allegations of which are fairly summarized as follows:

I.   The March 18, 1977, proxy statement is false and misleading with respect to certain material facts and therefore violates § 14(a) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78n(a)[3] and SEC Rule 14a–9.[4]   The proxy statement is alleged to be false and misleading in the following ways:

a) it misrepresents the reasons for the resignations of Waspe and Pfeiffer;

b) it misrepresents the reasons for management's recommendation and the Board decision to reduce the number of directors for the forthcoming year;

c) it is misleading in that it fails to disclose that the reduction and reclassification of the Board violates Pa.Stat.Ann. tit. 15, § 1403;

d) it is misleading in that it fails to disclose that the reduction and reclassification of the Board violates § 3.1 of Belmont's corporate by-laws;

e) it is misleading in that it fails to disclose the pending and other litigation and certain allegations of corporate mismanagement against present management;

f) it is misleading in that it fails to adequately inform the voting shareholders how directors resigning for health or other personal reasons can be expected to adequately discharge the management duties which the proxy statement indi-

cates they intend to continue and/or the consequences to plaintiffs, other shareholder, or Belmont, should they attempt to continue.

In addition, by reason of the expedited discovery process, it appears that at least one of the above charges of falsity has been abandoned while at least one new charge has been asserted by way of plaintiffs' briefs.   Plaintiffs additionally assert that the proxy statement was false and misleading in that

g) it fails to disclose that the reduction and reclassification of directors would effectively frustrate any attempt by non-management shareholders to elect a director in a two-member class of directors; i. e., plaintiffs' rights under state law to cumulative voting were frustrated and the proxy statement did not so state;

h) it fails to disclose that Pfeiffer and Waspe were not bona fide candidates when nominated, since Belmont's management knew or were aware at that time that Pfeiffer or Waspe did not wish to and would not serve additional terms as directors.

II.   Count II of the complaint is related to Count I in that it alleges that the reduction of Class A directorships from four to two while maintaining two other classes of directorships with four members apiece violates Pa.Stat.Ann. tit. 15, § 1403 which requires that where there is a classified board of directors the number of directors in each class be "as nearly

---

**3.**   Section 14(a) provides:

It shall be unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce of of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78*l* of this title.

**4.**   Rule 14a–9 provides:

No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statement therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

equal as possible."[5] Jurisdiction over this state law claim is alleged under the principles of pendent jurisdiction.

### IV.

Before examining separately the various allegations of falsity and nondisclosure with respect to the Belmont proxy statement, the purpose of § 14(a) and rule 14a–9 and the elements of a cause of action thereunder require brief discussion.

In *J. I. Case Co. v. Borak*, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964), the Supreme Court held that the broad remedial purposes of § 14(a) made it necessary to imply a private cause of action for violations of that provision and the rule promulgated thereunder. In so holding, the Court recognized

> [t]he purpose of § 14(a) is to prevent management from obtaining authorization for corporate action by means of deceptive or inadequate disclosure in proxy solicitation.

*Id.* at 431, 84 S.Ct. at 1559. In *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970), the Supreme Court addressed the issue of what causal relationship must be shown between an alleged defective proxy statement and the corporate transaction accomplished pursuant to the solicited proxies, in order to establish a cause of action based upon § 14(a). The Court held that it was not necessary to show that the alleged misrepresentation or omission in the proxy statement had a decisive effect upon the results of the shareholder voting; rather, it was only necessary to demonstrate that the defect was *material* and that the proxy solici-

tation was an essential link in the accomplishment of the corporate action. The *Mills* Court echoed the statements of the *Borak* decision when it stated that § 14(a)

> was intended to promote "the free exercise of the voting rights of stockholders" by ensuring that proxies would be solicited with "explanation to the stockholder of the real nature of the questions for which authority to cast his vote is sought."

*Id.* at 381, 90 S.Ct. at 620, *quoting* legislative history. As a result of *Mills*, it became apparent that *materiality* was a key, if not the crucial, factor in § 14(a) actions, although the Court reserved for the lower federal courts the vexing problem of defining materiality. Predictably, the various courts of appeal differed in their formulations of standards of materiality, though these differences may have been more semantical than practical.[6] In *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976), the Supreme Court addressed this inter-court of appeals conflict and announced a general standard of materiality under § 14(a) and rule 14a–9 as follows:

> [A]n omitted fact is material if there is a *substantial likelihood* that a reasonable shareholder *would* consider it important in deciding how to vote.

*Id.* at 449, 96 S.Ct. at 2133 (emphasis added). The emphasis in the quotation from *TSC Industries* is to underscore the Supreme Court's expressed concern that the omitted facts or false statement have a *propensity* to influence voting shareholders and not merely a *potential* to do so. *Id.* at 445–47, 96 S.Ct. 2126.

---

**5.** Section 1403 provides:

> If the articles so provide, the directors of the corporation may be classified with respect to the shareholders, other security holders or governmental or other entities who exercise the power to elect directors. If the articles or by-laws of a business corporation so provide, the directors of the corporation may be classified in respect to the time for which they shall severally hold office, except that the first directors shall serve only until the first annual meeting. In such case, each class shall be as nearly equal in number as possible, the term of office of at least one class shall expire in each year, and the mem-

bers of a class shall not be elected for a shorter period than one year, or for a longer period than four years. If, at any meeting of shareholders, due to a vacancy or vacancies, or otherwise, directors of more than one such class are to be elected, each class of directors to be elected at the meeting shall be elected in a separate election.

**6.** *Compare Northway, Inc. v. TSC Indus., Inc.*, 512 F.2d 324 (7th Cir. 1975), *rev'd* 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976) *with Gerstle v. Gamble-Skogmo, Inc.*, 478 F.2d 1281 (2d Cir. 1973).

■ *Borak, Mills*, and *TSC Industries* represent the major statements of the Supreme Court on § 14(a). Although these decisions clarify in general language the basic elements of a § 14(a) course of action, the district courts and courts of appeal must still determine on their own whether specific omissions or statements are "false or misleading" within the meaning of rule 14a–9. Guidance as to the definition of materiality and the necessary causal relationship has been provided, as noted above. It can also be said that insofar as *affirmative representations* contained in a proxy solicitation are concerned, in order to establish a violation of § 14(a) and rule 14a–9 the representations must be "false or misleading." More importantly to this case, insofar as *omissions* are concerned, it is not enough that the omitted facts be material; as the rule plainly states the omitted facts must also be such that they are necessary in order to make the statements in the proxy not false or misleading. *Perelman v. Pennsylvania Real Estate Inv. Trust*, 432 F.Supp. 1298 (E.D.Pa.1977); *Ash v. Brunswick Corp.*, 405 F.Supp. 234 (D.Del.1975). I have no doubt that under the rulemaking authority granted the SEC by § 14(a) that a rule prohibiting *all* omissions of material fact in a proxy statement could have been promulgated; however, the SEC apparently saw fit, in its expert judgment, to merely prohibit those omissions of material fact which render the affirmative statements false or misleading.

Keeping in mind all of the above, the allegations of violations of § 14(a) and rule 14a–9 will be examined separately.

## V.

### A. Allegations as to the stated reasons for the resignations of Waspe and Pfeiffer.

■ These allegations can be disposed of with relative ease. Put simply, the record fails to disclose anything which would suggest that Messrs. Waspe and Pfeiffer did not resign their directorships for the precise reasons set forth in the proxy statement. On the contrary, the uncontradicted deposition testimony of Messrs. Waspe and Pfeiffer, conducted by plaintiffs' counsel, fully support those reasons expressed in the proxy statement.

Thus, there being no falsity to the representations in the proxy statement as to why Waspe and Pfeiffer resigned, there is no violation of rule 14a–9.

### B. Allegations as to the failure to disclose that Waspe and Pfeiffer were not bona fide candidates for Class A directorships when nominated.

■ As a corollary to part "A" above, it is evident from the record that Waspe and Pfeiffer were "bona fide" candidates when nominated by the Board on February 22, 1977. Although plaintiffs would have us believe otherwise, Waspe and Pfeiffer were nominated by the Board in the good faith belief that they would serve as directors if re-elected at the shareholder meeting on April 19, 1977. Plaintiffs briefs and arguments suggest that certain of the individual defendants conceived of and orchestrated a course of action whereby Waspe and Pfeiffer would be re-nominated and later would withdraw at a time when it would appear to be inconvenient or impractical for Belmont to seek replacement nominees, thus reducing the number of Class A directorships up for election to two and effectively thwarting plaintiffs' exercise of cumulative voting. Although several of the defendant-directors may have been aware that Pfeiffer or Waspe were not particularly desirous of continuing their roles as Belmont directors, there is no basis in the record to conclude that at the time of their renomination the Board or any of its individual members knew that Waspe or Pfeiffer would later decline to serve additional terms as directors.

The allegation as to falsity being unsupported, there is no violation of rule 14a–9 with respect to plaintiffs' assertion that defendants knew that Waspe and Pfeiffer were not "bona fide" candidates when renominated for directorships. *See Haberman v. Murchison*, 468 F.2d 1305, 1313 (2d Cir. 1972).

C. *Allegations as to the management recommendation and Board decision to reduce the number of directors to be elected at the annual shareholder meeting.*

■ Plaintiffs contend that the proxy statement was patently false when it reported that "management recommended" to the Board that there be no replacement nominees to fill the gaps left as a result of the Pfeiffer and Waspe resignations; they assert that indeed there was no formal or informal management recommendation and that such a statement is materially false in that a reasonable shareholder would place great weight upon a specific endorsement of management. As set out in the recitation of fact in part II above, the initial decision not to seek replacement nominees and in effect reduce the Board from 12 to 10 directors was made by Bergman, either by himself, or in conjunction with Ray or Ron Perelman. The record on this point is, however, unclear, as the depositions of Bergman as compared to those of the Perelmans are not entirely consistent or inconsistent as to what occurred at Belmont's executive offices on or about March 11, 1977, the day Waspe communicated his resignation by telephone. It is only clear that Bergman formulated the Unanimous Consent circulated to the individual members of the Board and there is no proof of any resistance or objection to that course of conduct by any executive officer of Belmont. It seems to me that Bergman, as Secretary and General Counsel, is at the very least an important part of Belmont's *management* team and that the Unanimous Consent formulated by him constituted a *recommendation* that certain Board action be taken. Keeping in mind that plaintiffs agreed to submit this case to the court on the existing record and that, as in all general civil cases, plaintiffs bear the burden of proving each element of their cause of action by a preponderance of the evidence, I cannot conclude that the statement in question was false or materially misleading. Hence, there is no violation of the proxy rules as to this allegation.

D. *Allegations as to the failure to inform how directors resigning for health or personal reasons can be expected to continue to function in their managerial positions with subsidiary companies.*

■ Although plaintiffs' briefs ignore this allegation and thus suggest that it has been abandoned, it will be addressed nonetheless, as it was formally pleaded in the complaint. The proxy statement states that management recommended that no replacement nominees be designated to fill the Waspe and Pfeiffer positions, that the Board executed a Unanimous Consent resetting the number of directors at ten, and that Pfeiffer and Waspe "indicated they had no intention of resigning their other positions with the Company at this time." The record is absolutely devoid of any proof that any of these statements are false. More importantly, it is apparent to me that the failure to state how Waspe and Pfeiffer could continue as managers of subsidiary companies despite resignations as directors for health or personal reasons does not render the affirmative statements made false or misleading. The statements related to this allegation were complete in themselves, and further comments were not necessary in order to render those statements not false or misleading. Therefore, there is no violation of rule 14a-9.

E. *Allegations as to the failure to disclose the pending and other litigation and charges of corporate mismanagement against present management.*

■ Plaintiffs' complaint and briefs charge that the proxy statement omitted material facts when it failed to disclose not only the existence of the instant lawsuit but also the existence of a separate state-court action instituted by certain of the plaintiffs in order to obtain certain internal corporate information. Plaintiffs also complain of the failure to disclose certain allegations of corporate mismanagement; this latter assertion need not be addressed as the record reveals no evidence by way of document or deposition establishing the existence and nature of such mismanagement allegations.

As to the failure to disclose the existence of litigation, plaintiffs, curiously enough, complain in part that the proxy statement was silent as to the "pending litigation." If by this plaintiff meant the instant lawsuit, the problems are immediately obvious; the proxy statement was filed and mailed on or about March 18, 1977 while the present complaint was filed on April 18, 1977, the day immediately prior to the shareholder meeting. It would be an interesting legal theory indeed to impose upon a corporation the duty to disclose in its proxy material not-yet-existent litigation.

■ As to the state-court action pending at the time at the dissemination of the proxy statement, it is conceivable that in certain circumstances there could exist a duty to disclose in a proxy statement the pendency of lawsuits against the corporation or its officers or directors. *See Chris-Craft Indus., Inc. v. Independent Stock Comm.,* 354 F.Supp. 895 (D.Del.1973); *Robinson v. Penn Central Co.,* 336 F.Supp. 655 (E.D.Pa.1971); *Beatty v. Bright,* 318 F.Supp. 169 (S.D.Iowa 1970). Although it is not clear from the record, apparently certain Belmont shareholders sued in state court seeking to obtain access to corporate documents including Belmont's by-laws.[7] Though the Belmont Proxy statement made mention of certain tender offer litigation involving Raymond Perelman, no mention as to the state-court action was made. In the context of materiality as defined by the Supreme Court in *TSC Industries,* it is always perplexing for a court *ex post facto* to determine whether there is a substantial likelihood that certain omitted facts would have been considered important by a reasonable shareholder in deciding how to vote on matters presented for shareholder approval. As the only matter to be voted upon at the Belmont shareholder meeting of April 19, 1977 was the election of two Class A directors, the absence of any information concerning the state-court litigation appears to be immaterial, particularly in light of the fact that these other matters were unrelated to the candidacies of certain individuals for directorships. The cases such as *Chris-Craft, Robinson* and *Beatty, supra,* are distinguishable in that they each involved a failure to disclose pending lawsuits involving the competence or integrity of corporate officers and directors who were either nominees for election or participants in a corporate transaction subject to shareholder approval. Such is not the case here. The state-court litigation pending at the time of the mailing of the Belmont proxy material, though perhaps not routine litigation in the strict sense of that word, is certainly not unusual or abnormal in the corporate world, and in any event is immaterial to the election of two directors neither of whom are Belmont management personnel involved in the alleged wrongful refusal to turn over corporate documents to shareholders. *See Ash v. Baker,* 392 F.Supp. 368 (E.D.Pa.1975), *aff'd,* 530 F.2d 963 (3d Cir. 1976); *Lyman v. Standard Brands Inc.,* 364 F.Supp. 794 (E.D.Pa.1973).

The information which the proxy statement failed to disclose not being material, there is no violation of rule 14a–9 as to this allegation.

F.  *Allegation as to the failure to disclose that the reduction and reclassification of the Board of Directors violates Pennsylvania statutory corporate law and Belmont's corporate by-laws.*

■ The provision of Pennsylvania's corporation laws concerning classified boards of directors has been set out in the margin, note 5 *supra.* Pa.Stat.Ann. tit. 15, § 1403. As pertinent to this lawsuit, that provision requires that where a Pennsylvania corporation maintains a classified board of directors, each class of directors "shall be as nearly equal in number as possible." Section 3.1 of Belmont's corporate by-laws tracks this statutory provision in that it states "[t]he Directors of the Corporation shall be classified into three classes which

---

7.  Plaintiffs have left the court very much uninformed as to the nature, purpose, and status of this state-court litigation. Indeed, but for the naked statements of counsel in various legal memoranda, the record is essentially empty as to proof which would establish even the existence of such litigation. Nevertheless, it will be assumed the litigation does exist as described.

shall be as nearly equal in number as possible . . . ."

Plaintiffs here argue that the reduction of Class A directors from four to two and the consequent restructuring of the Belmont Board to a four-four-two configuration of classes violates the "as nearly equal as possible" requirements of § 1403 and by-law 3.1, and that the failure to disclose such in the proxy statement constitutes a violation of rule 14a–9. It has already been established that both Messrs. Waspe and Pfeiffer withdrew their nominations for re-election to directorships for valid reasons and for the very reasons stated in the proxy material. There is also evidence in the record which reveals that these withdrawals took place approximately a week before the proxy statement was mailed to the SEC and to Belmont shareholders, and about five to six weeks before the annual shareholder meeting. Certain deposition testimony suggests that Belmont management felt it either impractical or inconvenient at that late stage to search for replacement candidates and it was decided instead to restructure the Board and elect two Class A directors. There is no question, as plaintiffs argue, that *mathematically* a division of ten directorships into classes of four, four and two is *not* "as nearly equal in number as possible." However, it is uncertain whether a strict mathematical standard was intended by the framers of § 1403, or for that matter, the authors of the Belmont by-laws. The words "as possible" may also be glossed with notions of pragmatics so as to be construed as meaning "as is practical under the circumstances." Neither of the parties has cited a single Pennsylvania decision definitively interpreting § 1403 and our research likewise uncovers no such cases. Fortunately, whether the reduction and reclassification of the Belmont Board violated Pennsylvania business corporation law need not be decided, because it is determined that at the time of the proxy solicitation this unsettled and speculative question of state corporate law need not have been disclosed to Belmont shareholders by virtue of rule 14a–9. Independently, and on the basis of appellate court precedent, I find that the failure to so disclose is not a violation of rule

14a–9. In *Ash v. LFE Corp.*, 525 F.2d 215 (3d Cir. 1975), our court of appeals faced the issue of whether the failure to disclose that a proposed management pension plan might violate Delaware corporate law (because it was ultra vires) was a material omission and violative of rule 14a–9. The court initially pointed out that the corporation did not agree with the plaintiff's legal theory, a theory which had not even been called to its attention prior to the issuance of the proxy statement. Further the court stated:

> The facts are disclosed. If a shareholder concludes from those facts that the pension plan is a subterfuge for a gift, he can take appropriate action both at the stockholder meeting and thereafter. No case has been called to our attention requiring disclosure of speculative issues of state corporation law in a proxy solicitation.

*Id.* at 220. The *Ash* case is instructive and persuasive precedent. To the extent that it holds that a proxy statement need not present a shareholder's unproved and unannounced legal theory as to the consequences of certain corporate action where the underlying facts are either fully presented in the proxy statement or obvious to shareholders, it is here applicable and will be followed. *Cf. Allen v. Penn Central Co.,* 350 F.Supp. 697, 703–04 (E.D.Pa.1972). In addition, there appears to be no reason not to apply the identical logic and rationale to the claim involving § 3.1 of Belmont's corporate by-laws.

For the above reasons, the allegation as to the failure to disclose violations of state law and corporate by-laws are found to have no legal basis for a rule 14a–9 violation.

G. *Allegations as to the failure to disclose that the reduction and reclassification of directors would effectively frustrate any attempt by nonmanagement shareholders to elect a director in a two-member class of directors and that such a course of action denies plaintiffs their rights under state law to cumulative voting.*

This claim is quite similar to the claim discussed directly above in part "F" in that

it asserts the denial of an alleged right under state corporate law and the failure to so disclose in the proxy material. It is apparent from the record and discussion by the court with counsel, that the inability of the plaintiffs, as a cohesive group, to elect a director at the annual meeting of April 19, 1977, is the real nub of this lawsuit. Though not put in evidence as part of the record, it has been suggested that plaintiffs are deeply concerned with the conduct of the present Belmont management and Board and that by the election of one of their own to the Board they could become privy to the processes of management decision-making and also to certain corporate information and documents.

Again, the court turns to *Ash v. LFE Corp., supra,* for guidance. Whether the course of action taken by the Belmont Board in reducing the number of Class A directorships up for election is a violation of plaintiffs' state rights to cumulative voting, is an unsettled question of Pennsylvania corporate law. *See Stockholders Comm. for Better Management v. Erie Tech. Prod., Inc.,* 248 F.Supp. 380 (W.D.Pa.1965). Assuming *arguendo* the figures provided to the court regarding the number of shares held by the respective parties, it is likely that plaintiffs, had they cumulated and pooled their votes, would have been able to elect one director if there had been four Class A directorships up for election. It is equally clear that where there were only two directorships to be voted upon, plaintiffs were unable to elevate a candidate of their choosing to the Belmont Board.[8] However, as *Stockholders Committee, supra,* and the cases discussed therein explain, the mere fact that the effect of cumulative voting has been diminished by the reduction of directorships up for election does not necessarily dictate that a cause of action under state law to void such an election lies. The cases speak of schemes or plans which completely and absolutely deny the effec-

tiveness of cumulative voting, such as a situation where the directorships are divided into classes so that only one may be elected each year. Though it is not here necessary to reach this state law issue, the Supreme Court of Pennsylvania has stated:

> As far as the [cumulative voting] provision is concerned, it is absolutely clear and unambiguous in what it provides and what it does not provide: It grants the right of cumulative voting but it does not purport to insure the maximum effectiveness of the exercise of that right to obtain minority representation on the board of directors. All that the [cumulative voting provision] provides is that each stockholder should have the right to concentrate his votes on one or more candidates to be chosen in any given election; that right is undisputed, but as to how many candidates there shall be at the election, whether they must consist of all the directors of the corporation, whether they cannot be classified and their elections staggered,—as to these and many other factors which necessarily enter into each situation the [cumulative voting provision] is wholly silent; to write into it any such limiting or qualifying provisions as contended for by the plaintiff would be an extreme exercise of judicial legislation.

*Janney v. Philadelphia Transp. Co.,* 387 Pa. 282, 288–89, 128 A.2d 76, 80 (1956). In any event, whether the reduction of Class A directors from four to two violated plaintiffs' rights under state law to effectively cumulate their shareholder votes is a "speculative issue of state corporation law" which is immaterial information and need not have been disclosed in order to make other assertions in the Belmont proxy statement not false or misleading. Therefore, there was no violation of rule 14a–9 as to these allegations.

In summary, having separately examined all the allegations as to violations of § 14(a)

---

8. Pa.Stat.Ann. tit. 15, § 1505 provides in pertinent part:

[E]very shareholder entitled to vote shall have the right to multiply the number of votes to which he may be entitled by the total number of directors to be elected in the same election . . . and he may cast the whole number of such votes for one candidate or he may distribute them among any two or more candidates. The candidates receiving the highest number of votes . . . shall be elected.

and rule 14a–9 in connection with the Belmont proxy statement of March 18, 1977, I conclude there were no such violations.

## VI.

Having found no violations of the federal securities laws regulating the solicitation of proxies, the question of whether this court should entertain the pendent state claim (Count II of the complaint) must be decided. *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). In a situation, such as the present case, where the federal claims have been "tried" and fully addressed on the merits, the normal course of action for a federal district court in exercising its discretion would be to entertain and adjudicate pendent state claims; *Gibbs* impliedly so instructs. *See McCurnin v. Kohlmeyer & Co.*, 477 F.2d 113, 115 n.2 (5th Cir. 1973). The *Gibbs* decision counsels that the justification for assuming jurisdiction over pendent state claims "lies in considerations of judicial economy, convenience and fairness to litigants." *Gibbs, supra,* 383 U.S. at 726, 86 S.Ct. at 1139. However, in explaining these tripartite considerations, the *Gibbs* Court went on to say:

> Needless decisions of state law should be avoided *both as a matter of comity* and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law.
>
> . . . Similarly, if it appears that the state issues substantially predominate, whether in terms of proof, of the scope of the issues raised, or of the comprehensiveness of the remedy sought, the state claims may be dismissed without prejudice and left for resolution to state tribunals. . . .
>
> The question of power [to assert jurisdiction] will ordinarily be resolved on the pleadings. But the issue whether pendent jurisdiction has been properly assumed is one which remains open throughout the litigation. . . . Once it appears that a state claim constitutes the real body of a case, to which the federal claim is only an appendage, the state claim may fairly be dismissed.

*Id.* at 726–27, 86 S.Ct. at 1139 (footnotes omitted) (emphasis supplied). Though it cannot be said that plaintiffs' federal claims here were frivolous or insubstantial, it is apparent that the only federal issues of any difficulty or substance were those allegations involving the defendant's failure to disclose in the proxy material unsettled issues of state corporate law; to be sure, the pendent state claim itself involves one of those very unsettled issues. In light of the fact that pendent jurisdiction is a discretionary power exercisable even at this late juncture of the proceedings, and that the pendent claim is one involving important unsettled issues of Pennsylvania corporate law, and that the rationale of *Gibbs* includes considerations of comity between state and federal interests, the court will decline to assert jurisdiction over Count II of the complaint. It seems to me that the state claim "constitutes the real body of [the] case" and that, therefore, it should be dismissed without prejudice and left for resolution by the Pennsylvania courts.

Judgment will be entered for the defendants as to the federal claims, and the pendent state claims will be dismissed without prejudice.